**GROVE CITY COLLEGE, individually and on behalf of its students; Marianne Sickafuse; Kenneth J. Hockenberry; Jennifer S. Smith and Victor E. Vouga, Appellant,**

v.

**T. H. BELL, Secretary of U. S. Department of Education; Harry M. Singleton, Acting Assistant Secretary for Civil Rights, U. S. Department of Education, Appellee.**

**GROVE CITY COLLEGE, individually and on behalf of its students; Marianne Sickafuse; Kenneth J. Hockenberry; Jennifer S. Smith and Victor E. Vouga, Appellees,**

v.

**T. H. BELL, Secretary of U. S. Department of Education; Harry M. Singleton, Acting Assistant Secretary for Civil Rights, U. S. Department of Education, Appellant.**

Nos. 80–2383, 80–2384.

United States Court of Appeals, Third Circuit.

Argued June 21, 1982.

Decided Aug. 12, 1982.

David M. Lascell (argued), Nixon, Hargrave, Devans & Doyle, Rochester, N. Y., for appellant in No. 80–2383, appellee in No. 80–2384; David M. Lascell, David A. Stern, Robb M. Jones, Michael A. Hausknecht, Rochester, N. Y., of counsel.

William Bradford Reynolds, Asst. Atty. Gen., Brian K. Landsberg, Marie E. Klimesz (argued), Mark H. Gallant, of counsel, Dept. of Justice, Washington, D. C., for appellee in No. 80–2383, appellant in No. 80–2384.

Robert J. Cindrich, U. S. Atty., W. D. Pa., Pittsburgh, Pa., Myrna P. Field, Mid-Atlantic Legal Foundation, Philadelphia, Pa., for amicus curiae Rockford College.

James G. Watt, Maxwell A. Miller, Mountain States Legal Foundation, Denver, Colo., for amicus curiae.

Margaret A. Kohn, Marcia D. Greenberger, National Women's Law Center, Washington, D. C., Philip P. Frickey, Shea & Gardner, Washington, D. C., for amici curiae American Ass'n of University Women et al.

Before GARTH and BECKER, Circuit Judges, and MUIR,* District Judge.

---

\* Honorable Malcolm Muir, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

1. Pub.L.No.92–318, §§ 901–07, 86 Stat. 373–75.

2. Section 902 provides in relevant part:

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal involves the Department of Education's authority to enforce Title IX of the Education Amendments of 1972,[1] against a college which receives no direct funds from the federal government, but whose students receive federal grants. The district court granted Grove City College's motion for summary judgment and refused to permit the termination of Basic Educational Opportunity Grants to students at the College, holding that the Title IX enforcement regulations were invalid. We reverse.

### I.

### A.

Title IX proscribes gender discrimination in education programs and activities receiving federal financial assistance. Title IX "contains two core provisions." *North Haven Bd. of Educ. v. Bell,* —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Section 901(a) of the 1972 Act contains a program-specific ban of sex discrimination:

> No person in the United States shall, *on the basis of sex,* be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any education program or activity receiving Federal financial assistance....*

20 U.S.C. § 1681 (emphasis added).

Under section 902, each agency awarding federal financial assistance "other than a contract of insurance or guaranty" to any education program or activity is authorized to promulgate regulations to insure compliance with section 901(a). If compliance cannot be secured by voluntary means, section 902 authorizes the termination of federal funds to the program in which noncompliance is found. 20 U.S.C. § 1682.[2]

> Each Federal department and agency which is empowered to extend financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section [901(a)] of this title with

The Department of Education is the primary administrator of federal financial assistance to education.[3] Pursuant to its regulations, 34 C.F.R. § 106.4(a), the Department requires each recipient of federal aid to file an Assurance of Compliance as a means of securing adherence to Title IX.[4] Under the Assurance in use at the time of this case was filed, the recipient agreed that it would

> [c]omply, to the extent applicable to it, with Title IX ... and all requirements imposed by ... the Department's regulation ... the end that, in accordance with Title IX ... no person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any education programs or activity for which the Applicant receives or bene-

fits from federal financial assistance....[5]

In addition, recipients provided basic information about their programs, including a "self-evaluation" under Title IX (A. 18).

### B.

Grove City College (Grove) is a private co-educational institution of higher education affiliated with the United Presbyterian Church and located in Grove City, Pennsylvania. Approximately 2,200 students attend Grove (A. 33). One hundred forty of Grove's students are eligible to receive Basic Educational Opportunity Grants (BEOGs) appropriated by Congress and allocated by the Department pursuant to 20 U.S.C. § 1070a. Three hundred forty-two of Grove's current students have obtained Guaranteed Student Loans (GSLs).[6] Other than through the BEOG or GSL programs,

---

respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law....

3. Originally the Department of Health, Education and Welfare had primary responsibility for administering federal assistance to education. This action was brought against the Department of Health, Education and Welfare, since it had issued the administrative order under Title IX terminating assistance to students attending Grove. Subsequently, when the Department of Education was established to take over the education functions of HEW, Title IX enforcement authority was transferred to the Department of Education by Section 301(a)(3) of the Department of Education Organization Act,

Pub.L.No.96–88, 93 Stat. 677, 678. The Secretary and Department of Education were substituted as defendants in this action by order of the Clerk of this Court.

Unless further specificity is demanded by the context, the defendants, including the Department of Health, Education and Welfare and any successor will be referred to as "the Department."

4. 34 C.F.R. § 106.4(a) provides in relevant part:
   Every application for Federal financial assistance for any education program or activity shall as [a] condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Assistant Secretary, that each education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part.

5. The Assurance of Compliance currently in use provides that the applicant "will comply with ... Title IX ... which prohibits discrimination on the basis of sex in education programs and activities receiving federal financial assistance."

6. Under the student loan program, a GSL is provided by a private lending institution which lends funds directly to the student. The GSLs are guaranteed by the Commonwealth of Pennsylvania. In turn, the United States, guarantees 80% of the Commonwealth's obligation. The federal government pays interest subsidies on these loans. 20 U.S.C. § 1077.

Grove receives no federal or state financial assistance.[7]

BEOGs are paid by the Department directly to the eligible students attending Grove. Grove, however, executes the institutional section to the students' BEOG applications and certifies ·data involving the student applicants' costs and enrollment status so that the students might receive federal financial assistance.[8]

In July, 1976 the Department began efforts to secure an Assurance of Compliance from Grove based upon the receipt of BEOGs and GSLs by Grove students. Grove refused to execute the Assurance, asserting that it received no federal financial assistance. The Department then initiated administrative proceedings to terminate grants and loans to students attending Grove.

After an administrative hearing, an Administrative Law Judge (ALJ) concluded that Grove was a recipient of federal financial assistance within the meaning of Title IX and that the allocation of BEOG's and GSL's could be terminated for Grove's refusal to execute an Assurance of Compliance. Since Grove conceded that it did not file an Assurance of Compliance, the ALJ entered an order prohibiting the payment of BEOG's or GSL's to students attending Grove.

### C.

On November 29, 1978, Grove, joined by four student BEOG and GSL recipients,[9]

commenced this suit. The plaintiffs sought an order which would declare void the Department's termination of BEOG and GSL assistance. Additionally, they sought to enjoin the Department from requiring Grove to file an Assurance of Compliance as a condition of preserving its eligibility in the BEOG and GSL programs. Finally, the complaint sought a declaration that the anti-sex discrimination regulations promulgated by the Department went beyond the authority contained in Title IX, or alternatively, that those regulations were unconstitutional as applied to Grove. Cross-motions for summary judgment were filed on the basis of affidavits and the administrative record (A. 30, 101).

### D.

In an amended opinion on June 26, 1980 the district court granted Grove's motion for summary judgment and denied the cross-motion of the Department. Although the Court agreed with the Department that BEOGs and GSLs constituted "federal financial assistance" to Grove within the meaning of Title IX, it concluded that the Department could not terminate federal assistance to Grove City students because of Grove's refusal to sign an Assurance of Compliance.

The district court set forth several alternative rationales for its conclusions. First, the court held that 20 U.S.C. § 1682, which denies Title IX enforcement authority with

---

**7.** In its brief, Grove has explained its policy in refusing funds:

Since its founding in 1876, the College, as an integral part of its philosophy, steadfastly refused any form of government funding. . . .
. . . The College also informed HEW that it has always refused to accept financial assistance from any governmental source since to do so would compromise its independence. Brief for Appellants, No. 80–2383, at pp. 3–4.

**8.** There are two methods of disbursement of BEOGs. Under the Regular Disbursement System, the Department advances the funds to the educational institution, which then either pays the student by check or credits the grant against the student's account. 34 C.F.R. §§ 690.71, 690.78. Under the Alternative Disbursement System, the grants are mailed directly to the students after the institution makes the appropriate certification. 34 C.F.R. 690.91. Grove's participation in the BEOG program involves the latter method of alternative disbursement.

**9.** According to their affidavits, for academic year 1978–79, student plaintiff Marianne Sickafuse received a BEOG totaling $408, Kenneth Hockenberry received a BEOG totaling $654 and a GSL totaling $2,000, Jennifer Smith received a GSL for $1,000, and Victor Vouga received a GSL totaling $2,500 (A. 58, 76, 95, 97). In affidavits, the student plaintiffs each represented that without these funds "I will be unable to continue in attendance at [Grove City College] the college of my choice" (A. 59, 77, 96, 99).

respect to "a contract of insurance or guarantee," precluded the Department from terminating GSLs.[10] Second, the court concluded that the Department could not require Grove to sign an Assurance of Compliance since subpart E of the Department's regulations which prohibit discrimination in employment was held to be invalid. Alternatively, the court held that the Department had unlawfully terminated Grove's federal financial assistance based solely upon Grove's refusal to sign the Assurance. The court concluded that such a termination is authorized by Title IX only upon an actual finding of sex discrimination (A. 134–38), a finding which the Department had not made. Finally, the court held that the Department was barred by the due process clause of the fifth amendment from terminating the BEOGs without first affording hearings to all students who would be adversely affected (A. 132–133).

The court's final amended order (1) declared that the Assurance of Compliance form (HEW Form 639A) was invalid; (2) enjoined the Department from using the Assurance of Compliance form; (3) enjoined the termination of financial assistance to the plaintiffs unless actual sex discrimination was proved at an administrative hearing with notice to all those affected by the proceeding; and (4) enjoined the termination of GSL's to students.

The Department's appeal, No. 80–2384, and Grove's cross-appeal, No. 80–2383 followed.[11]

## II.

At the outset, we consider Grove's cross-appeal because a threshold question on this appeal is whether Grove, which has refused all federal financial assistance, nevertheless is to be considered a recipient of such assist-

ance within the meaning of section 901(a) because its students receive federal grants.

The Department has construed the phrase "federal financial assistance" to include educational grants paid to students, and, thus, received indirectly by the schools which they attend. The regulation defines federal financial assistance in relevant part as

(1) A grant or loan of Federal financial assistance, including funds made available for:

\* \* \* \* \* \*

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, *or extended directly to such students for payment to that entity.*

34 C.F.R. § 106.2(g)(1)(ii).

The Department's regulations further define a "recipient" of federal financial assistance:

(h) *"Recipient"* means ... any person, to whom Federal financial assistance is extended directly *or through another recipient and which operates an education program or activity which receives or benefits from such assistance,* including any subunit, successor, assignee, or transferee thereof.

30 C.F.R. § 106.2(h).

Thus, the Department maintains that Grove is a "recipient" because students attending Grove receive federal monies in the form of BEOGs which monies are used to pay their educational expenses at Grove.

Grove challenges the Department's inclusion of BEOGs within the scope of "federal financial assistance" under section 901(a). According to Grove, the phrase "federal financial assistance" refers only to direct payments to institutions or educational pro-

---

**10.** In the district court, the Department claimed that the furnishing of GSLs, as well as BEOGs, made Grove a recipient of federal financial assistance so that it became subject to Title IX. As noted in text, the district court held that GSLs were contracts of guarantee within the exception to section 902(a). On appeal the Department does not contest the district court's conclusion. Brief for the Department at

2 n.2. Thus, the issue of GSLs is not presented on this appeal.

**11.** Grove's cross-appeal was filed to preserve its contention that the mere acceptance of BEOGs by Grove's students did not bring Grove within Title IX, as a recipient of federal financial assistance.

grams, and, thus, does not include educational grants paid to students when the educational institution involved plays no role in choosing the beneficiaries or designating amounts of aid. Answering Brief for Appellants at 7, n.6. Since BEOGs are paid to students based on eligibility requirements determined by the federal government, Grove contends Title IX is not implicated.

### A.

In determining the scope of Title IX, we begin with the statutory language itself. *North Haven Board of Education v. Bell*, —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). The language of section 901(a) extends Title IX's coverage to "any education program or activity receiving Federal financial assistance...." Hence, by its all inclusive terminology the statute appears to encompass *all* forms of federal aid to education, direct or indirect.

Grove, however, argues that the statute has no application to it. Section 901, argues Grove, applies to "any ... program or activity receiving federal financial assistance," and it must be conceded, contends Grove, that it "receives" no such assistance. Although Grove acknowledges that it benefits from federal aid which its students receive, Grove claims that this is insufficient to bring Grove's activities within the ambit of Title IX. In effect, Grove reads the statute as pertaining only to direct aid and not to indirect assistance.

Giving Title IX the broad reading that its remedial purpose dictates, *see North Haven*, —— U.S. at ——, 102 S.Ct. at 1917, we cannot agree with the manner in which Grove interprets § 901(a) or with its conclusion that § 901(a) is limited solely to direct assistance.

### B.

The enactment of Title IX in 1972 was the culmination of efforts over several years to ban gender discrimination in the field of education. Patterned after Title VI of the Civil Rights Act of 1964, which proscribes discrimination by reason of race, color, religion, or national origin, "[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Cannon v. University of Chicago*, 441 U.S. 677, 696, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979).[12] Indeed, the legislative history reveals that Title IX was designed to fill the gap left by Title VI of the Civil Rights Act of 1964, which did not prohibit discrimination based on sex. *See, e.g.*, 118 Cong.Rec. 5807 (1972) (Remarks of Senator Bayh).

Just as Title VI was structured so that federal monies would not be expended in *any* fashion[13] which would subsidize racial discrimination,[14] so too, was the use of fed-

---

**12.** Title VI provides:
> No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

In addition, the provision authorizing administrative enforcement of Title IX through termination or refusal of federal aid is virtually identical to the administrative enforcement provisions found in Title VI. *Compare* 20 U.S.C. § 1682 (Title IX) *with* 42 U.S.C. § 2000d–1 (Title VI).

**13.** During the floor debates on the 1964 Civil Rights Act, Senator Humphrey stressed:
> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in *any* fashion which *encour-*

*ages, entrenches, subsidizes, or results* in racial discrimination.

110 Cong.Rec. 6543 (Sen. Humphrey, quoting from President Kennedy's message to Congress, June 19, 1963) (emphasis added). *See also* 110 Cong.Rec. 7054–55 (1964) (remarks of Sen. Pastore).

**14.** The legislative history of Title VI clearly indicates that it was intended to cover indirect assistance programs, including educational programs. For example, Congressmen Poff and Cramer introduced a partial list of programs which would be embraced by Title VI. See H.R.Rep.No. 914 (1963) (Separate Minority Views of Hon. Richard H. Poff and Hon. William Cramer) *reprinted in* 1964 U.S.Code Cong. & Ad.News 2391, 2471–73. At least two of the programs on the list involve grants or awards to students. See 42 U.S.C. § 242d(b) (1970) (repealed Pub.L. 94–484, § 503(b) (1976) (grad-

eral funds proscribed for the support of educational institutions that discriminated on the basis of sex.

Indeed, in *Cannon v. University of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1978), the Supreme Court recognized that Title IX, like Title VI, was designed "to avoid the use of federal resources to support discriminatory practices. ..." The legislative history of Title IX amply supports this conclusion.

### C.

In 1971, the provisions embodying Title IX were first introduced by Senator Bayh as an amendment to S. 659, 92d Cong., 1st Sess. (1971), the Education Amendments of 1971. A major feature of S. 659 was the establishment of the Basic Educational Opportunity Grant program. Speaking in support of the amendment, Senator Bayh stated:

> The bill deals with equal access to education. Such access should not be denied because of poverty or sex. If we are going to give all students an equal education, women must finally be guaranteed equal access to education....
>
> [i]t does not do any good to pass out hundreds of millions of dollars if we do not see that the money is applied equitably to over half our citizens.

117 Cong.Rec. 30412 (1971). The same sentiments were expressed in the House. 117 Cong.Rec. 39252 (1971).[15]

Statements made during the 1971 debates on Senator Bayh's proposal demonstrate that the funds subject to Title IX encompassed virtually all federal assistance to education, including BEOG grants to students. Supporting Senator Bayh's amendment to the Bill which provided for the establishment of the BEOG program, S. 659, Senator McGovern stated:

> I urge the passage of [Senator Bayh's] amendment to assure that *no* funds from S. 659, the Omnibus Education Amendments Act of 1971, be extended to any institution that practices biased admissions or educational policies.

117 Cong.Rec. 30,158–59 (1971) (emphasis added).

Similarly, when Senator Bayh was asked what type of aid might be subject to termination under Title IX, he responded, "We are cutting off *all* aid that comes through the Department of Health, Education and Welfare...." 117 Cong.Rec. 30408 (1971).

■ Although Senator Bayh's 1971 amendment was not adopted, he reintroduced his amendment to S.659 on February 28, 1972 and the amendment was adopted that day. See 118 Cong.Rec. 5815 (1972).[16] It is that amendment that was ultimately enacted as Title IX, and which is involved in this appeal.[17] While it is true that the

---

uate training for physicians, engineers, nurses and other professional personnel providing for grants to individuals or institutions); 20 U.S.C. § 461–65 (graduate fellowships). *But see* Note, *Title VI, Title IX, and the Private University: Defining "Recipient" and "Program or Part Thereof,"* 78 Mich.L.Rev. 608 (1980).

**15.** The floor debates in the House and Senate, while meager, are still the most authoritative source of Title IX legislative history. *See North Haven,* —— U.S. at ——, 102 S.Ct. at 1919. In the Senate, Title IX was introduced as a floor amendment, so no Committee report discusses its provisions. By the same token, in the House, little insight was given by the Committee Report which accompanied H.R. 7248 (The Higher Education Act of 1971), a Bill which contained a prohibition of gender discrimination in federally funded education programs. *See* H.R.Rep.No.554, 92 Cong. 1st Sess. (1971) *reprinted in* 1972 U.S.Code Cong.

& Ad.News 2462, 2511–12. The differences between the House and Senate versions, none of which are relevant here, were resolved in the Conference on the Education Amendments of 1972. *See* S.Conf.Rep.No.798, 92d Cong. 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 2608.

**16.** In introducing the 1972 amendment, Senator Bayh stated that it provided a "comprehensive approach which incorporated ... the key provisions of my earlier amendment...." 118 Cong.Rec. 5808 (1972).

**17.** Senator Bayh's 1971 amendment never came to a vote on the floor of the Senate because it was ruled nongermane to S.659. See 117 Cong.Rec. 30415 (1971).

Although there were some differences between Senator Bayh's 1971 proposal and his amendment that was actually adopted in 1972,

legislative history makes no explicit reference to "indirect" financial assistance such as student grants, the 1971 debates make it clear that Congress' overriding objective in enacting Title IX, that is, to withhold public funds from an institution which engages in sex discrimination, was to deny to discriminating institutions all such financial support, direct or otherwise. Thus, as we construe the legislative history it is consistent with the Department's position that Title IX applies to any institution which receives indirect or direct federal financial assistance. In light of Congress' intent which we have gleaned from the legislative history of Title IX, we are satisfied that monies which are paid to students, who in turn use those funds for their education, constitute no less a part of a college's revenues than federal monies paid directly to the institution itself.

▆▆▆ This being so, the Department was well within its authority when it defined "recipient" to include any institution which receives federal financial assistance "through another recipient." 34 C.F.R. § 106.2(h). Grove thus became a "recipient" within the regulations when it received federal monies that had been granted to its students for their use in educational pursuits.

### D.

In addition to contemporaneous legislative history, the post-enactment history of Title IX provides further evidence that BEOGs come within the scope of "federal financial assistance."

After the Department published its final Title IX regulations on June 4, 1975, (40 Fed.Reg. 24128) they were submitted to Congress for review pursuant to § 431(d)(1) of the General Education Provisions Act, Pub.L. 93–380, 88 Stat. 567, as amended, 20 U.S.C. § 1232(d)(1). This statutory provision affords Congress the opportunity to examine an agency regulation and, if it finds the regulation "inconsistent with the Act from which it derives its authority . . .," Congress is enabled to disapprove the

regulation by a concurrent resolution. If no such concurrent resolution is passed within 45 days of the submission of the regulation to Congress, the regulation becomes effective.

During the Congressional review of the Title IX regulations, the subject of indirect aid was specifically addressed. Legislators were explicitly informed by HEW Secretary Weinberger that the Department construed "federal financial assistance" to include indirect student assistance programs:

> Our view was that student assistance, assistance that the Government furnishes, that goes directly or indirectly to an institution is Government aid within the meaning of Title IX. If it is not, there is an easy remedy. Simply tell us it is not. We believe it is and base our assumption on that.
>
> As Mr. Rhinelander [then HEW General Counsel] says the court case [*Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974), *aff'd mem.*, 529 F.2d 514 (4th Cir. 1975)] confirms this belief.

*Sex Discrimination Regulations: Hearings Before the Subcomm. on Postsecondary Education of the House Comm. on Education and Labor*, 94th Cong., 1st Sess. 481–484 (1975) ("Postsecondary hearings").

In response to this Departmental interpretation, Senator Helms introduced a proposed concurrent resolution that would have disapproved the regulation because it did not limit the application of Title IX to programs and activities directly receiving "federal financial assistance." *See* S.Con.R. 46, 121 Cong.Rec. 13300 (1975). In addition, several other proposed concurrent resolutions were introduced that would have disapproved the regulation in its entirety. *See* H.R.Con.Res. 310 (Rep. Martin) 121 Cong. Rec. 19209 (1975); H.Con.Res. 329 (Rep. O'Hara), 121 Cong.Rec. 21687 (1975); H.R. Con.Res. 330 (Rep. O'Hara), 121 Cong.Rec. 21687 (1975). No "disapproval" resolution was passed by either House.

these differences do not undermine our conclusion that the 1971 debates demonstrate that

Title IX, as enacted, was intended to cover both direct and indirect financial aid.

Although Congress' failure to pass any of the concurrent resolutions does not definitively establish that it considered those regulations to be consistent with, and authorized by, Title IX, it does lend weight to the argument that coverage of BEOGs was intended, especially since the Department's construction of the phrase "federal financial assistance," was specifically brought to the attention of Congress.[18] The failure of Congress to pass a resolution disapproving the Department's "indirect aid" regulation is particularly significant, since Congress did not hesitate in amending § 901 when it disagreed with the Department respecting the scope of that section.[19] Indeed, Congress has declined to enact new legislation that was specifically designed to accomplish the result which Grove urges upon us. On the very day that the 45-day review period for the Department's regulation expired, Senator Helms introduced a bill that would have provided that "Title IX shall apply only to programs and activities which *directly* receive Federal financial assistance." S. 2146, 94th Cong., 1 Sess. (1975); *see* 121 Cong.Rec. 23845–23847 (1975) (emphasis added). Congress took no action on the Helms bill.

Subsequently, in 1976 Senator McClure proposed a similar amendment to Title IX that provided: "For purposes of this chapter, federal financial assistance received, means assistance received by the institution directly from the federal government." 122 Cong.Rec. 28144 (1976). In his statement in support of this proposal, Senator McClure

made it apparent that had his amendment passed, Grove's interpretation of Title IX would undoubtedly be correct. Senator McClure stated:

> The particular abuse in this instance, the one that I am seeking to correct here . . . Hillsdale College, [is] subjected to Federal controls by way of student assistance or a GI grant to a student. Hillsdale College has gone to great pains to avoid any appearance of Federal support. They have not participated in Federal aid programs. They desire to be completely independent of the Federal taxpayer in the support of the institution. They are being subjected to Federal control because some student may have Federal assistance. My amendment would simply say that it has to be a direct Federal assistance before they are subjected to the HEW regulations at all.

122 Cong.Rec. 28145 (1976).

These remarks brought forth an immediate and vigorous response from Senator Pell, the prime Senate sponsor of the educational opportunity grant programs included in the Education Amendments of 1972. Senator Pell declared:

> [T]he enactment of this amendment would mean that no funds under the basic grant program [i.e., the BEOG program] would be covered by Title IX.
>
> While these dollars are paid to students they flow through and ultimately go to institutions of higher education, and I do not believe we should take the position

**18.** Grove argues that we should accord no weight to Congress' failure to disapprove the Department's regulations. This argument rests on 20 U.S.C. § 1232(d)(1) which provides, in part, that the failure of Congress to adopt a concurrent resolution disapproving a final regulation should not be construed as approval of the regulation.

However, that provision in 20 U.S.C. § 1232(d)(1) was enacted approximately four months after the Department's regulations went into effect. *See* Pub.L.No.94–142 § 7(a)(1) (enacted November 29, 1975). Moreover, in its decision upholding subpart E of the Department's regulations, the Supreme Court concluded that the failure of Congress to pass disapproving resolutions was a factor to con-

sider in interpreting section 901 of Title IX. *See North Haven*, —— U.S. at —— – ——, 102 S.Ct. at 1925 (1982).

**19.** Prior to the period of regulatory review, but after the Department had published its regulations for comment, Congress enacted legislation excepting social fraternities, sororities, and voluntary youth organizations from the reach of section 901. Pub.L.No.93–568; § 3(a), 88 Stat. 1862 (1974). In 1976, Congress enacted three additional exceptions to section 901's coverage. *See* Pub.L.No.94–482, § 412 (1976) (codified at 20 U.S.C. § 1681(a)(7)–(9). (Boy or girl conferences, father-son or mother-daughter activities, and beauty pageant scholarship awards).

that these Federal funds can be used for further discrimination based on sex.

*Id.*

Similarly, Senator Bayh, the Senate sponsor of the language that was ultimately enacted as Title IX, vigorously announced his opposition to Senator McClure's amendment. The correct interpretation of Title IX, according to Senator Bayh, was the Department's construction that "federal financial assistance" included BEOGs, since student grants *benefited* the educational institution.

> The House committee studied this [Departmental] interpretation. I emphasized at that time that Title IX, which dealt with discrimination so far as women are concerned, is parallel in its language and enforcement expectations with Title VI of the Civil Rights Act. The courts have held that Title VI * * * does apply if a student receives Federal aid. *If a student is benefited, the school is benefited.* It is not new law; it is tradition, and I think in this instance it is a pretty fundamental tradition, that we treat all institutions alike as far as requiring them to meet a standard of educational opportunity equal for all of their students.

122 Cong.Rec. 28145–28146 (1976) (emphasis added).

On that same day, soon after the remarks by Senators Pell and Bayh, Senator McClure's proposed amendment to Title IX was defeated by a 50 to 30 vote.

█ Although postenactment history is not always accorded controlling weight, *see Southeastern Community College v. Davis,* 442 U.S. 397, 411 n.11, 99 S.Ct. 2361, 2370 n.11, 60 L.Ed.2d 980 (1979) (concluding that subsequent isolated statements by individual legislators or committee members "cannot substitute for a clear expression of legislative intent at the time of enactment"), here, where the Department's interpretation of "federal financial assistance" has been directly brought to Congress' attention, Congress' specific rejection of proposed legislation that would have overturned that interpretation provides a substantial indication that it was Congress' in-

tent to include BEOG's within the coverage of section 901. Indeed, in *North Haven Bd. of Educ.,* which upheld the Department's Title IX regulation governing employment discrimination, the Supreme Court relied, as we do here, on the post-enactment history of Title IX. In so doing, the Court stated:

> Although postenactment developments cannot be accorded "the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX . . . ." Where "an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned."

—— U.S. at ——, 102 S.Ct. at 1925 (citations omitted). *Accord, Cannon v. University of Chicago,* 441 U.S. 677, 687 n.7, 99 S.Ct. 1946, 1952 n.7, 60 L.Ed.2d 560 (1979).

### E.

█ A case under Title VI which supports our conclusion that Grove is a recipient of federal aid within the meaning of Title IX, is *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974), *aff'd mem.,* 529 F.2d 514 (4th Cir. 1975).

In *Bob Jones,* the Department had ordered that eligible veterans enrolled at Bob Jones University could not receive veterans' educational benefits because the University engaged in racially discriminatory practices. The University then sought injunctive relief from that order, arguing that, since the benefits were paid directly to veterans, it was not the University which received federal financial assistance, and, therefore, the University was not subject to Title VI. The district court rejected the University's argument and dismissed the injunction. It held that VA educational benefits, even though paid directly to students, constituted federal financial assistance to the University within the purview of Title VI.

The *Bob Jones* court based its reasoning on the broad remedial purpose of Title VI and the fact that the University benefited in two distinct ways from the payment made to student veterans. First, "payments to veterans ... releas[e] institutional funds which would, in the absence of federal assistance, be spent on the student." 396 F.Supp. at 602. Second, "the participation of veterans who—but for the availability of federal funds—would not enter the educational programs ... enlarg[es] the pool of qualified applicants upon which [the school] can draw for its educational program." Id. at 603. Finally, in holding that indirect veterans' educational benefits were subject to Title VI, the *Bob Jones* court stated:

> Whether the cash payments are made to a university and thereafter distributed to eligible veterans rather than the present mode of transmittal is irrelevant, since the payments ultimately reach the same beneficiaries and the benefit to a university would be the same in either event. To argue otherwise would be to suggest that the applicability of Title VI turns on the role of a university as an exchange.... No rational distinction with respect to Title VI coverage can be made on this basis.

Id. at 603–04. *See also McGlotten v. Connally*, 338 F.Supp. 448 (D.D.C.1972) (three-judge court) (disallowing tax deductions for contributions to racially segregated fraternal organizations as such deductions constitute federal financial assistance under Title VI.)

The decision in *Bob Jones* figured importantly in the postenactment history of Title IX. During the debates on the McClure amendment in 1976, *see supra*, which would have limited the coverage of Title IX solely to "direct" federal financial assistance, Senator Bayh specifically referred to the *Bob Jones* decision under Title VI.

> [T]he inclusion of students who get Federal assistance is not unique. If we followed this route [in amending Title IX] then the next step is to repeal Title VI of the Civil Rights Act because the court has held in other civil rights matters that if a student gets assistance from the Federal

Government the university itself is assisted.

> The case of Bob Jones University against Johnson is a specific case in question.

122 Cong.Rec. 28145 (1976).

The district court here relied almost solely on the *Bob Jones* analysis when it concluded that indirect federal financial assistance, i.e. BEOGs, brought Grove within the coverage of Title IX. Our discussion of the statute, its legislative history, post-enactment events, and the *Bob Jones* decision has led us to the same conclusion. Thus, we are satisfied that the district court did not err in this ruling.

### III.

Section 901 of Title IX also provides that the ban against sex discrimination is restricted to an "education *program or activity* receiving Federal financial assistance." 20 U.S.C. § 1681. In addition, § 902 limits the Department's authority to terminate federal funding to "the *particular program*, or part thereof" which does not comply with the regulatory requirements. 20 U.S.C. § 1682.

Grove argues that construing "federal financial assistance" as including BEOGs is necessarily incompatible with, and mutually exclusive of the statutory requirement that enforcement of Title IX be "program specific." According to Grove, Title IX's reference to "program" or "activity" clearly indicates that the Act's prohibition of sex discrimination cannot apply on a generalized, nonprogrammatic, or institutional basis. Instead, Grove claims that only those programs or activities for which Federal funds are specifically earmarked, are made subject to the Act, and it is only those particular programs or activities from which federal assistance can be withheld in the event violations are found within the particular identified program. From that conclusion, Grove reasons further that because indirect student assistance, such as BEOG grants, cannot be tied to any specific program or activity at an educational insti-

tution, Grove cannot, consistent with the program specificity requirement, be a "recipient of federal financial assistance," and, thus, Grove argues, it is not subject to Title IX. In essence, Grove contends that subjecting an entire institution to the requirements of Title IX only by reason of its students' receipt of BEOGs, runs counter to Congress' expressed intent, which limits the application of Title IX to specific programs or activities.

We concede, as we must, that Title IX's provisions, on their face, are program-specific. *See North Haven*, —— U.S. at ——, 102 S.Ct. at 1925.[20] We cannot agree, however, that Congress intended to limit the purpose and operation of Title IX by a narrow and illogical interpretation of its program-specific provisions. Rather, we believe that Congress intended that full scope be given to the non-discriminatory purpose that Title IX was enacted to achieve, and that the program-specific terms of Title IX must therefore be construed realistically and flexibly. By so doing, contrary to Grove's argument, complete accommodation can be achieved between the concepts of "indirect federal financial assistance" and "program-specific" requirements.

### A.

We have previously noted that Title IX is a counterpart of Title VI and is to be similarly interpreted. Like its Title VI counterpart, Title IX also requires that any withdrawal of federal funding must be restricted to the particular activity or program in which discrimination is found. It is apparent from the legislative debates that the legislators were profoundly concerned with the possibility of arbitrary and overbroad funding terminations. Fears were expressed during the Title VI debates that an unlimited termination sanction invoked by reason of an isolated violation might result in wholesale cut-off of federal assistance to an entire state thereby affecting state programs unrelated to, and not identified with, the discriminatory practices.[21]

As we understand these legislative concerns, the legislators did not contemplate that separate, discrete, and distinct components or functions of an integrated educational institution would be regarded as the individual programs, to which sections 901 and 902 refer. Whatever the legislators did contemplate by their use of the term "program or activity" we can be certain of only two things: (1) "program or activity" was never intended to be defined in the narrow and restrictive manner urged by Grove; and (2) the precise meaning, content, and parameters of "program" as it applies to the issue presented here have never been established.

Substantiating our view that to date little definitional content has been given to the term program, is the Supreme Court's recent Title IX decision in *North Haven*. In that case, although implicitly adopting an institutional approach to the concept of program,[22] the Supreme Court nevertheless,

---

**20.** In *North Haven*, the Supreme Court held that, "[A]n agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitation of §§ 901 and 902." —— U.S. at · ·, 102 S.Ct. at 1925.

The Court, however, then held that the employment regulations promulgated under Title IX conformed to the program-specific requirement. It is significant, however, that the court did not attempt to define the contours of "program" in its opinion. Thus, to this extent, *North Haven* does not control our decision.

**21.** As Senator Ribicoff stated:

[I]f there were discrimination in one school district which refused to desegregate, we certainly would not wish to cut off public assistance or cut off road programs. Under Title VI we would deal with each program separately and apply Title VI only where the discrimination occurs.

110 Cong.Rec. 7067 (1969). *Accord*, 110 Cong. Rec. 11942 (1964) (remarks of Attorney General Kennedy); 110 Cong.Rec. 2059, (1964) (remarks of Sen. Pastore); Comment, Board of Public Instruction v. Finch: *Unwarranted Compromise of Title VI's Termination Sanction*, 118 U.Pa.L.Rev. 1113, 1116–24 (1970) [hereinafter cited as Finch Comment].

**22.** We note that Justice Powell's interpretation of the majority opinion in *North Haven* indicates that the Court, in validating the Department's employment regulations, had inclined towards an institutionalized application of Title

left to the district court the determination of what constituted the "program" and the extent of the permissible termination of federal funds.

Indeed, legal commentators and the few courts confronted with the need to define "program" have recognized that neither the statutes, by their terms, nor the legislative history resolve the question of what constitutes the "program or activity." *See, e.g., Finch Comment*, 118 U.Pa.L.Rev. at 1116–24; Todd, *Title IX of the 1972 Education Amendments: Preventing Sex Discrimination in Public Schools*, 53 Texas L.Rev. 103, 107–13 (1974); Note, *School Desegregation and the Office of Education Guidelines*, 55 Geo.L.J. 325, 344–45 (1966); *Haffer v. Temple University*, 524 F.Supp. 531 (E.D.Pa. 1981), *appeal pending*, No. 82–1049 (3d Cir.).[23] *See also* Note, *supra* note 14.

## B.

■ However "program" may be defined when a *direct* federal grant is involved (an issue not presented here), we are not persuaded that where non-earmarked or *indirect* funding is involved, those statutes proscribing discrimination should be rendered ineffective and without force. As was argued by amicus American Association of University Women, in its supplemental letter memorandum:

However the Supreme Court ultimately defines "program", it cannot conclude that the more general the scope and pur-

pose of the funding, the more restrictive the coverage of this remedial civil rights restrictive the coverage of this remedial civil rights statute will be. That result would be logically inconsistent. Yet Grove City asks this court to decide that an institution whose entire purpose is educational is exempt from coverage when it is financed with federal funds that can be used for virtually any educational purpose instead of a clearly limited function. The absurd result if this approach is followed to its logical conclusion is that general higher education aid would never bring the college under Title IX coverage because no specific program within the College would be earmarked to benefit from the federal funding.

American Association of University Women Memorandum, at p. 5–6.

The same principle is implicit in the formula of one legal commentator who defined "program" along these lines:

[I]f two programs, one receiving federal aid directly and one not, are both administered by the same local agency for the education of essentially the same group of students, and if the funding of the former facilitates the latter by freeing funds for its use, or if discrimination in the latter affects the former by inhibiting or prohibiting a student's participation in that program, then both will be considered part of the same program

IX, rather than an ear-marked program approach. Justice Powell so argues because the majority opinion includes within Title IX's coverage, employees such as secretaries, guidance counselors, and janitors, who were not participants in any separate, identifiable grant program. *See North Haven*, —— U.S. at ——, n.3, 102 S.Ct. at 1928, n.3 (Powell, J., dissenting op.).

**23.** Grove relies on the decision in *Board of Public Instruction of Taylor County, Florida v. Finch*, 414 F.2d 1068 (5th Cir. 1969), a Title VI case. In *Finch*, HEW had terminated Federal financial assistance to the Taylor County Elementary and Secondary Public School District for its failure to comply with HEW guidelines governing desegregation. The court vacated the termination order and remanded the case to HEW, because HEW had failed to make find-

ings that any of the programs receiving Federal aid had been affected by racial discrimination. The court noted that the school system was receiving money under three federal grant statutes for three specific activities—supplementary education centers, adult education, and education of children from low income families. Each grant statute, concluded the court, constituted the program for purposes of Title VI. 414 F.2d at 1077.

We do not find the decision in *Finch* to be helpful or dispositive of the issues presented by this appeal. *Finch* involved neither across-the-board assistance for general educational purposes nor indirect federal financial assistance. Nor was the *Finch* court required to go beyond the particular grants in aid there at issue, in determining the contours of the program affected.

for purposes of bringing the latter within the reach of Title IX.

Todd, *supra*, 55 Texas L.Rev. at 112.[24] *See also* Note, *supra* note 14, at 624.

The view that non-earmarked or indirect federal funding brings within the definition of "program" an entire integrated institution is supported by the decision in *Haffer v. Temple University*, 524 F.Supp. 531 (E.D. Pa.1981), *appeal pending*, No. 82–1049 (3d Cir.). That case involved the question of whether Temple University's intercollegiate athletic program was subject to Title IX even though no federal funds had been earmarked for athletics. Temple conceded that it received substantial federal financial assistance for other educational purposes. Nevertheless, Temple argued that "its intercollegiate athletic program is exempt from the requirements of Title IX because it receives no federal funds earmarked for the use of that program", and that "the implementing regulations are invalid insofar as they cover programs or activities that 'benefit from' federal financial assistance but do not receive earmarked funding." 524 F.Supp. at 532.

In the *Haffer* opinion, then Chief Judge Lord analyzed the pertinent legislative history and concluded that, during the statutorily mandated Congressional review of the Department's regulations, the major focus of controversy centered on whether inter-collegiate athletics were covered by Title IX. *See* Hearings on Title IX Before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 94th Cong., 1st Sess. 46, 66, 98, 304 (1975) [hereinafter Postsecondary Hearings]; *Haffer* at 536. However, despite the vigorous debate over whether the regulations included athletics, Congress passed no disapproving resolution.[25]

Additionally, the court emphasized that after enactment of Title IX, numerous attempts were made to amend it so as to exclude from the Act's coverage, in whole or in part, intercollegiate athletics.[26] All these attempts were defeated.

Judge Lord thereupon denied Temple's motion for summary judgment. In denying that motion, he reasoned:

> Logic supports a broad reading of Title IX and supports upholding the validity of the regulations. Congress explicitly amended Title IX to exclude social fraternities and sororities from its coverage. I cannot imagine what possible federal funds could have been earmarked for these programs. If such indirectly (if at all) benefitted programs were never intended to be covered by Title IX, it is inexplicable that Congress felt the need to exempt them specifically on another basis. Congressional consideration of the

---

**24.** Under Title VI, the former Office of Education regarded a school district's educational system as a single entity or program because discrimination in any particular component of the school program would obviously affect and taint the entire system. It was suggested that any narrower interpretation of a "program" would make it impossible to terminate aid to a school district because each dollar of assistance would have to be related to discriminatory practices. Note, *supra*, 55 Geo.L.J. at 344–45.

**25.** See text *supra*, at 693–694 discussing Congressional authority to review and disapprove regulations.

We note that Senator Bayh, in his testimony before the House Committee reviewing the regulations, stated:

Those [objecting to the regulation's application of Title IX to athletics] argue that (1) the scope of Title IX is narrow and defined only to include those education programs that received direct federal financial assistance, and

(2) since athletics is not an educational program in direct receipt of federal aid, Title IX cannot and should not apply.

This objection to the coverage of programs which receive indirect benefits from federal support—such as athletics—is directly at odds with the Congressional intent to provide coverage for exactly such types of clear discrimination. For example, although federal money does not go directly to the football programs, federal aid to any of the school system's programs frees other money for use in athletics.

Without federal aid a school would have to reduce program offerings or use its resources more efficiently. Title IX refers to federal financial assistance. If federal aid benefits a discriminatory program by freeing funds for that program, the aid assists it.

Postsecondary Hearings at 171.

**26.** *See* 524 F.Supp. at 534–35.

proposed regulations focused almost exclusively on coverage of athletic programs. Indeed, many opponents of such coverage viewed Title IX as the possible death knell of college sports. If intercollegiate athletic programs, which almost never receive direct federal funding, were not intended to be covered, why was this a burning issue in consideration of the regulations?

*Id.* at 541. *See also Poole v. South Plainfield Bd. of Educ.*, 490 F.Supp. 948 (D.N.J. 1980) (holding that section 504 of the Rehabilitation Act of 1973, which contains same program-specific provisions as Title IX, applies to all activities of a public school system receiving federal funds); *Wright v. Columbia University*, 520 F.Supp. 789 (E.D. Pa.1981) (same holding with respect to activities of a University).[27]

### C.

■ Where the federal government furnishes indirect or non-earmarked aid to an institution, it is apparent to us that the institution itself must be the "program." Were it otherwise, and if it had to be demonstrated that each individual component of an integrated educational institution had in fact received the particular monies for a particular purpose, no termination sanction could ever effectively be imposed.

■ We conclude that the remedy to be ordered for failure to comply with Title IX is as extensive as the program benefited by the federal funds involved. Because the federal grants made to Grove's students necessarily inure to the benefit of the entire College, the "program" here must be defined as the entire institution of Grove City College.[28] Thus, Grove is incorrect in

---

**27.** Grove relies on a number of decisions that have concluded that the program-specific requirement restricted Title IX's coverage to those programs or activities for which federal funds were specifically earmarked.

Most of these decisions, however, were reached in the context of deciding whether Title IX's employment regulations were invalid. *See, e.g., Seattle University v. HEW*, 16 F.E.P. 719 *aff'd* 621 F.2d 992 (9th Cir. 1980); *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979); *Junior College District of St. Louis v. Califano*, 597 F.2d 119 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980). (*See also* text, *infra*, at 701 & n.29.)

The Supreme Court has subsequently vacated the decisions in *Seattle University* and *Dougherty* for further consideration in light of *North Haven Bd. of Educ. v. Bell, see United States Department of Education v. Seattle University*, — U.S. —, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982); *Bell v. Dougherty County School System*, — U.S. —, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982).

In light of the Supreme Court's decision in *North Haven* and its further action in *Seattle University* and *Dougherty*, we conclude that the analysis of the program-specific requirement found in these cases on which Grove relies is questionable and we decline to follow it.

Similarly, we decline to follow *Othen v. Ann Arbor School Bd.*, 507 F.Supp. 1376 (E.D.Mich. 1981), *Bennett v. West Texas State University*, 525 F.Supp. 77 (N.D.Texas 1981), and *Rice v. President and Fellows of Harvard College*, 663

F.2d 336 (1st Cir. 1981). *Othen* and *Bennett* involved decisions, contrary to *Haffer*, that Title IX does not cover intercollegiate athletics. Both decisions relied heavily on the pre-*North Haven* employment regulation cases, as did *Rice.*

We also reject the reasoning and holding of *University of Richmond v. Bell*, 543 F.Supp. 321 (E.D.Va.1982), which enjoined the Department from investigating the University's athletic department or any educational program or activity not the recipient of *direct* federal financial assistance, even though the financial assistance which the University received included National Direct Student Loans, BEOGs, Supplemental Educational Opportunity Grants, and a Library Resource Grant.

**28.** Judge Becker's concurrence is admirable in its desire to avoid defining what is the "program" in this case. We would agree that had Grove not raised the issue of whether "indirect federal funding" and "program specificity" are mutually exclusive, we would not be obliged to address that issue in this opinion. Instead, we could have relied wholly on Grove's failure to execute the Assurance of Compliance. However, Grove's main, and indeed its only, argument of any merit was that because Title IX is program specific, it could not apply to Grove, since the "indirect aid" received by Grove was not aid to a specific program, but aid to the entire college. *See* typescript at 695–696 *supra.* At oral argument, Grove contended that to hold indirect aid to be financial assistance, thereby making the entire college the "program," would directly contradict the intention of Congress to limit the application of Title

claiming that the program-specific provisions of the statute preclude Title IX coverage when indirect aid is involved.

## IV.

The last issue raised by Grove in its appeal is that the Department cannot require it to comply with Title IX because enforcement of the regulations would unreasonably curtail the College's freedom of association and that of the students. Grove asserts that both it, and its students, have a protected right to associate in an academic community free from unreasonable governmental intrusion. According to Grove, the Department's enforcement of Title IX would impermissibly interfere with the College's autonomy and the values which it seeks to promote among its students.[29] Assuming, without deciding, that Grove has demonstrated a protected associational right, we believe that the reasoning found in a recent decision of the Supreme Court which addressed a federal-state cooperative

program for the developmentally disabled, disposes of Grove's argument. *Pennhurst State School v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Justice Rehnquist, writing for the Court, stated:

[O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States.... [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.

451 U.S. at 17, 101 S.Ct. at 1539 (citations omitted).

Congress has the same power to impose conditions on the use of funds granted to private educational institutions as it has when federal funds are granted to states. *Bob Jones University v. Johnson*, 396 F.Supp. 597, 606 (D.S.C.1974), *aff'd mem.*, 529 F.2d 514 (4th Cir. 1975). In any event, we find it difficult to understand how the

---

IX to specific programs and activities receiving federal financial assistance within an institution. Indeed, it likened the concepts of "indirect aid" and "program specificity" to oil and water.

Despite Judge Becker's claims that we ought not to address anything other than Grove's refusal to execute the Assurance of Compliance, he too agrees that we must respond to Grove's primary argument that "program-specificity cannot co-exist with a construction of Title IX that subjects Grove to regulation because of its receipt of [non-earmarked] BEOG funds." Concurring op. at 706. He would answer that argument precisely as did the *amicus* in its brief which we have quoted, *see* 698, *supra*. The answer thus given in the concurring opinion is no different than the answer we have been obliged to provide, and which appears in text above. Our answer, which also subscribed to the *amicus'* argument, and Judge Becker's endorsement of that argument, reveal no difference in the conclusions reached: namely, that where indirect, non-earmarked funding is involved, the "program" necessarily must embrace the entire college. Moreover, just as we have concluded that we are obliged to answer Grove's argument, Judge Becker also recognizes that this argument made by Grove must be answered.

Contrary to Judge Becker's fears, nothing that we have said in this opinion would foreclose further inquiry in a situation in which "for policy reasons [a college] builds a financial '[C]hinese wall' around a [particular] depart-

ment or school." Concurring op. at 706. Significantly, this case, does not present a factual configuration which would support theories involving such a "financial Chinese wall" or its corollary, *direct* financial aid to a particular program. As a consequence, no such argument was ever advanced by Grove, nor could it have been.

**29.** Grove describes its philosophy in the following manner:

Since its founding, Grove City College has professed deeply held beliefs regarding the proper role of the individual, government and private education. For over a century, the College has steadfastly maintained a strict independence from governmental funding, holding that the ideals embodied in its educational philosophy draw their essence from the practice of institutional self-sufficiency and autonomy. A similar philosophy guides the political and economic teaching of the College's faculty. Moreover, the College has continued its strong espousal of religious principles. Although it is not controlled or operated by any church, it retains its Christian conscience. It does not discriminate; it does maintain its programs to give equal opportunity to students, faculty and staff. The College has undertaken to do what is morally right without government compulsion.

Brief for Grove City College, No. 80–2384, at 35.

first amendment associational rights of Grove and Grove's students are infringed, since both Grove and the students are free to avoid the conditions imposed by Title IX by ending their participation in the BEOG program.

■ Moreover, the first amendment does not provide private individuals or institutions the right to engage in discrimination. Thus, neither Grove nor its students can assert an alleged first amendment right to be free of the strictures of Title IX's prohibitions of gender discrimination and also claim the right to continued federal funding. *Cf. Bob Jones*, 396 F.Supp. at 607 (Free exercise clause and freedom of association provide no right against termination of federal funding based on Bob Jones' racially discriminatory practices).

## V.

After concluding that Grove was subject to Title IX, the district court ruled that Grove's refusal to execute an Assurance of Compliance did not justify the Department's action in terminating funds paid to Grove's students under the BEOG program. The Department appealed this ruling.

## A.

■ First, the district court held that Grove could not be required to sign an Assurance of Compliance, because subpart E of the regulation, which prohibits discrimination in employment[30] was held by

the district court to be invalid. According to the district court, Title IX did not authorize the Department to proscribe employment discrimination in educational institutions. Four Courts of Appeals reached the same conclusion.[31] Only the Second Circuit concluded that subpart E was valid. *North Haven Bd. of Educ. v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980).

Since the district court's decision, the Supreme Court has resolved this issue by affirming the Second Circuit's decision. *See North Haven Bd. of Educ. v. Bell*, —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). As a consequence, there is no need for us to make an independent examination of the cases and legislative history for it has now been definitively determined that Title IX does reach discrimination in educational employment.

Since the district court incorrectly concluded that the employment discrimination regulations (subpart E) were void, so much of the district court's order which declared the Assurance of Compliance form invalid and which enjoined the Department from requiring Grove to sign the Assurance of Compliance is in error, and must be reversed.

## B.

■ In addition to declaring the Assurance of Compliance form invalid, the district court's order also enjoined the Department from terminating the payment of monies under the BEOG program until the

---

**30.** *See* 34 C.F.R. §§ 106.51–106.61 ("Discrimination on the Basis of Sex in Employment in Education Programs and Activities Prohibited").

**31.** *See Seattle University v. HEW*, 621 F.2d 992 (9th Cir.), *vacated and remanded for further consideration in light of North Haven sub nom. United States Dept. of Ed. v. Seattle Univ.*, —— U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982); *Romeo Community Schools v. HEW*, 600 F.2d 581 (6th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Junior College Dist. v. Califano*, 597 F.2d 119 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Isleboro School Comm. v. Califano*, 593 F.2d 424 (1st Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). *See also Kneeland v. Bloom Township*

*High School Dist.* 484 F.Supp. 1280 (N.D.Ill. 1980); *McCarthy v. Burkholder*, 448 F.Supp. 41 (D.Kan.1978).

In *Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980), *vacated and remanded for further consideration in light of North Haven sub nom. Bell v. Dougherty Cty School System*, —— U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982), the Fifth Circuit Court declined to rule that Title IX did not reach employment discrimination in educational institutions, but held that the subpart E regulation was facially invalid on the grounds that its coverage was not program specific—*i.e.*, that the regulation reached employment practices in programs or activities not receiving "federal financial assistance."

Department proved that Grove was actually engaged in gender discrimination. The district court concluded that § 902 of the Act, 20 U.S.C. § 1682, did not authorize the Department to terminate federal financial assistance just because an institution has refused to execute an Assurance of Compliance.

Section 902 of the Act provides the Department with the authority to enforce Title IX's ban against gender discrimination. By its very terms, section 902[32] authorizes the Department to terminate federal financial assistance in order to secure compliance with any regulatory requirement designed to effectuate the objectives of Title IX. Accordingly, the Department provided that, as a condition of approval of federal financial assistance, an assurance from a recipient that it would not discriminate is required. Moreover, by regulation the Department was to specify the form that assurance would take. 34 C.F.R. § 106.4(c).

The form prescribed did little more than identify the type of institution applying for federal funds. (A. 18). It required minimal information respecting grievance procedures in the event of complaints, and a statement of self-evaluation concerning the practices of the institution. Primarily it committed the recipient of funds to comply with Title IX and its regulations. As such it constituted a threshold device facilitating the enforcement of Title IX's objectives.

Thus, the assurance regulations, when read in conjunction with section 902, authorize the Department to terminate federal financial assistance upon a recipient's failure to execute an Assurance. We are satisfied that Title IX authorizes the promulgation of the assurance regulation and that the Department can therefore properly condition its grant or denial of funds upon adequate representations that the recipient will not discriminate.

Case law upholding parallel regulations and enforcement measures under Title VI of the Civil Rights Act of 1964 bolsters our conclusion that section 902 gives the Department authority to terminate funding when a recipient fails to comply with the assurance requirement. Section 902 was patterned after section 602 of the 1964 Act and the wording of the two provisions is virtually identical.[33]

In *Gardner v. State of Alabama*, 385 F.2d 804 (5th Cir. 1967), *cert. denied*, 389 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 889 (1968), HEW had terminated approximately $1,000,000 of funds under five separate federal assistance programs after the State of Alabama failed to execute an Assurance that it would undertake efforts to end racial discrimination in federally assisted programs. Alabama raised various objections to the assurance requirement all of which were rejected by the Court. The Court concluded that "the Secretary in issuing [the assurance] regulation was clearly acting within its [sic] rule making power conferred upon it [sic] by statute." 385 F.2d at 817 n.8. *See also United States v. El Camino Community College Dist.*, 600 F.2d 1258, 1260 (9th Cir. 1979), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 642 (1980) ("in exercising its investigatory powers ... HEW must have substantial latitude in scrutinizing policies and practices of the institution that may have a discriminatory impact on the intended beneficiaries of assistance").

As we read the district court's opinion in this case, it apparently believed that no authority existed for withholding financial assistance where the recipient refused to file an assurance as a matter of conscience and where no evidence of sex discrimination appeared in the record (A. 31). We conclude the district court erred in this respect.

Grove was given the choice of complying with the conditions of Title IX and the regulations promulgated thereunder or foregoing the benefits of federal funds. Grove chose not to comply, and the Department appropriately suspended the student

---

**32.** The relevant text of section 902 is reproduced in n. 2 *supra*.

**33.** A counterpart of the instant assurance requirement was promulgated under Title VI at 45 C.F.R. 80.4. *See* 42 U.S.C. 2000d–1.

grants through which Grove received the benefits of these monies. *Cf. Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). Thus, by enjoining the Department from terminating the BEOGs based on Grove's refusal to file an Assurance and additionally by requiring evidence of actual discrimination, the district court erred.

### C.

■ The district court also enjoined the Department from terminating funds under the BEOG program without affording students who would be adversely affected by such a termination notice and an opportunity to participate in a full administrative hearing. According to the district court, this requirement was mandated by the due process clause of the fifth amendment. We conclude the due process clause imposes no such requirement.

In *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), HEW had decertified a nursing home and ordered the termination of all Medicare and Medicaid assistance for patients at that home. In a suit brought by the home and six patients who were Medicare and Medicaid beneficiaries, the Supreme Court held that HEW was not required to afford due process hearings to patients as a prerequisite to disqualifying the home. In so doing the Court stated:

> [The grant program] clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified. Second, although the regulations do protect patients by limiting the circumstances under which a *home* may transfer or discharge a Medicaid recipient, they do not purport to limit the Government's right to make a transfer necessary by decertifying a facility. Finally, since decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility, regulations granting re-

cipients the right to a hearing prior to a reduction in financial benefits are irrelevant.

> In holding that these provisions create a substantive right to remain in the home of one's choice absent specific cause for transfer, the Court of Appeals failed to give proper weight to the contours of the right conferred by the statutes and regulations. As indicated above, while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified.

447 U.S. at 785–86, 100 S.Ct. at 2475 (footnotes omitted).

*O'Bannon* is dispositive of the due process issue raised here. We perceive no difference between the impact on the students when the Department terminated Grove as an eligible education program and the impact on the patients when HEW decertified the nursing home in *O'Bannon.* If the *O'Bannon* patients had no enforceable expectation of continued benefits to pay for care at Town Court when that nursing home was decertified, neither would Grove's students have an enforceable expectation of receiving grants to attend Grove, after Grove's participation in the BEOG program was ended.

Each student receiving a BEOG has separately been found entitled to receive federal assistance on the basis of personal need and of his or her family's financial status. *See* 34 C.F.R. 690 Subparts C and D. Nothing in the Department's termination of Grove would detract from the individual eligibility of any student to receive a grant. But, as was true in *O'Bannon,* a student at Grove has no right to continued federal benefits to pay for his education at an institution that has not qualified by meeting the conditions for federal assistance. Thus, we reject the claim of the student-plaintiffs that a due process hearing was required.

### VI.

We have concluded that Grove is a recipient of federal financial assistance within

the meaning of Title IX, even though that assistance is received indirectly through its students, who are the beneficiaries of federal grants. Second, we have concluded that the Assurance of Compliance form (HEW form 639A) was authorized and was valid. Finally, we have concluded that the Department was within its authority in terminating federal financial assistance to the students and to Grove for Grove's failure to execute and file, in accordance with the regulations, the Assurance of Compliance form.

Hence, so much of the district court's order, from which Grove appealed at No. 80–2383, and which held that Grove was a "recipient" within the meaning of Title IX, will be affirmed. So much of the district court's order, from which the Department appealed at No. 80–2384, and which invalidated the Assurance of Compliance form, and enjoined the Department from using that form and from terminating student BEOGs, will be reversed.

Accordingly, we will reverse so much of the district court's order of June 26, 1980, as is inconsistent with this opinion and with our holdings, and we will remand the case to the district court for the entry of an appropriate order consistent with this opinion.

BECKER, Circuit Judge, concurring in the judgment and in all but Part III of the opinion:

I agree with the result reached by the majority. I write separately because of the unnecessary breadth of the majority's opinion, which effectively decides cases not before this panel but which are or will someday be before this Court.

Part III of the majority opinion deals primarily with the question whether construing "federal financial assistance" to in-

clude BEOGs is necessarily incompatible with, and mutually exclusive of, the statutory requirement that enforcement of Title IX be "program specific." The majority answers this question by concluding that when the federal government furnishes indirect or non-earmarked aid to an institution, the institution itself must be the "program" for purposes of Title IX. (Majority op. at 699). That conclusion is unnecessary to the decision of this case. The controversy here does not implicate the application of Title IX to specific programs or activities within Grove's curriculum. Instead, the essential issue merely concerns Grove's refusal to execute the Assurance of Compliance. As a result, this case involves only a challenge to the facial validity of the Assurance of Compliance, and we need not pose the question raised by *Haffer v. Temple University*, 524 F.Supp. 531 (E.D.Pa. 1981), *appeal pending*, No. 82–1049 (3d Cir.), whether a particular program within a university which has executed the Assurance of Compliance may be regulated under Title IX.[1] The majority's conclusion in Part III–C thus is *dicta*.

Pursuant to its regulations, 34 C.F.R. § 106.4(a), the Department requires each recipient of federal aid to file an Assurance of Compliance as a means of securing adherence to Title IX. Under the Assurance in use at the time this case was filed, the recipient agrees that it will

[c]omply, to the extent applicable to it, with Title IX ... and all requirements imposed by ... the Department's regulation ... to the end that, in accordance with Title IX ... no person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any education programs or activity for which the Applicant receives or bene-

---

1. One reason for our concern about dealing with that question is that the issue raised in *Haffer* and *University of Richmond v. Bell*, 543 F.Supp. 321 (E.D.Va.1982), regarding whether the receipt of federal assistance subjects the entire institution to Title IX regulation, is highly controversial. In *University of Richmond*, Judge Warriner dubbed the theory adopted in

*Haffer* the "benefits" or "infection" theory. After surveying the same cases cited in the majority's note 27, he rejected *Haffer*, concluding that its approach was aberrational. The majority has pronounced that *Haffer* is correct and that the reasoning of the other courts is infirm. *See* Majority at 700, n. 27.

fits from federal financial assistance....[2]

Our decision in this case must be guided by *North Haven Bd. of Educ. v. Bell,* —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), in which the Court examined the program-specificity of regulations governing employment discrimination in recipient schools. The critical paragraph of the Court's discussion of the program-specificity issue states:

> Examining the employment regulations with this restriction in mind, we nevertheless reject petitioner's contention that the regulations are facially invalid. Although their import is by no means unambiguous, we do not view them as inconsistent with Title IX's program-specific character. The employment regulations do speak in general terms of an educational institution's employment practices, but they are limited by the provision that states their general purpose: "to effectuate title IX . . . [,] which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education *program or activity* receiving Federal assistance. . . ." (emphasis original) (footnote omitted).

—— U.S. at ——, 102 S.Ct. at 1926. The Court's discussion applies with equal force to this case. By its very terms, the Assurance of Compliance is program-specific, for it applies only to an "education *program or activity* for which the Applicant receives or benefits from Federal financial assistance. . . ." (emphasis supplied). The termination of assistance to Grove is equally program-specific, for the Department took this action only in response to Grove's refusal to assure, by executing the Assurance of Compliance, that it would not discriminate on the basis of sex in any program or activity receiving federal financial assistance.

I agree that it is necessary for us to respond to Grove's contention that program-specificity cannot coexist with a construction of Title IX that subjects Grove to regulation because of its receipt of BEOG funds not earmarked for use in any specific program at the institution. In response to Grove's argument, I would endorse the passage from the *amicus curiae* brief of the American Association of University Women quoted in the majority's opinion (Majority op. at 698). The conclusion of that passage—that it is incorrect to contend that the more general the scope and purpose of the funding the more restrictive the coverage of this remedial civil rights statute—is an effective shield against the contention that non-specific and non-earmarked BEOGs are necessarily incompatible with Title IX's program-specificity. The majority, however, turns this shield into a sword and reaches the conclusion, certainly dispositive of this case but nonetheless unnecessary to its disposition, that receipt of non-earmarked federal assistance transforms the entire institution into a "program" for purposes of Title IX.

I am concerned that the majority's overbroad decision will foreclose inquiry responsive to specific facts in cases in which a college or university, for policy reasons independent of a concern about Title IX regulation, builds a financial "chinese wall" around a department or school so that a particular program or activity is not funded out of the same pool into which federal assistance has been poured. My judicial experience has taught me that one cannot prejudge the kind of record or arguments that will be developed in future cases. Whether or not it is a long step from my analysis to the conclusion reached in Part III–C by the majority, it is a significant step, and one that ought not to be taken except in the context of a record or relevant legal arguments requiring that a decision on the point be made.[3]

---

**2.** The Assurance of Compliance currently in use is not materially different. *See* Majority Opinion n. 5.

**3.** Part III also purports to address the argument that because indirect student assistance, such

as BEOG grants, cannot be tied to any specific program or activity at an educational institution, Grove cannot, consistent with the program-specificity requirement, be a "recipient of federal assistance," and, thus subject to Title IX. I do not here address the majority's treat-

ment of that argument. Grove's status as a "recipient" is settled by the legislative history and by *North Haven*, as is ably demonstrated by Part II of the majority opinion.