**IRON ARROW HONOR SOCIETY, a "tap" or recognition association for men, et al., Plaintiffs-Appellants,**

v.

**Margaret M. HECKLER, Secretary of the Department of Health and Human Services, et al., Defendants-Appellees.**

**No. 80–5663.**

United States Court of Appeals, Fifth Circuit.* Unit B

April 11, 1983.

Roney, Circuit Judge, dissented and filed an opinion.

---

* Former Fifth Circuit case, section 9(1) of Public Law 96–452—October 14, 1980.

Du Fresne & Du Fresne, Elizabeth J. Du Fresne, Steel, Hector & Davis, Joseph P. Klock, Jr., Miami, Fla., for plaintiffs-appellants.

Drew S. Days, III, Asst. Atty. Gen., U.S. Dept. of Justice, Civil Rights Div., Walter W. Barnett, Irving Goldstein, William Bradford Reynolds, Jessica Dunsay Silver, Walter W. Barnett, Washington, D.C., for defendants-appellees.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before RONEY and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

## I. INTRODUCTION

This case involves the proper ambit of the non-discrimination and enforcement provisions of Title IX of the Education Amendments of 1972. 20 U.S.C. § 1681 *et seq.* It arises from the Supreme Court's order, —— U.S. ——, 102 S.Ct. 3475, 73 L.Ed.2d 1363 (1982), vacating our prior decision, 652 F.2d 445 (5th Cir.1981), and remanding in light of *North Haven Board of Education v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). We must determine how far the Secretary of the Department of Health, Ed-

ucation and Welfare [1] may extend the Congressional mandate to eliminate gender-based discrimination; the "simple justice" of this policy was articulated 20 years ago by President Kennedy with respect to discrimination on the basis of race:

> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes or results in racial discrimination. Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious. . . .

President's Second Civil Rights Message to Congress (June 19, 1963), set out in the Hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 88th Cong., 1st Sess., ser. 4, Pt. II, 1446, 1454 (1963). *Also see Lau v. Nichols,* 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974), *quoting* 110 Cong.Rec. 6543 (1963) (Remarks of Sen. Humphrey).

The Iron Arrow Society is the most prestigious honorary-recognition society at the University of Miami in Florida. Iron Arrow elects only men to membership. Male undergraduate and graduate students, alumni, faculty, administrators, and staff of the University are eligible for election to the Society on the basis of love for Alma Mater, leadership, scholarship, and humility. Those elected are initiated into the Society through a "tapping" ceremony. The Secretary determined, by letter of May 26, 1976, that the University of Miami, a private institution of higher education which receives substantial federal funding,[2] gave "substantial assistance" to Iron Arrow. This assistance, the Secretary determined, subjected the University to Title IX's prohibition against gender-based discrimination.

Iron Arrow was established at the time of the founding of the University. The first president of the University provided the impetus for its founding and granted a charter to Iron Arrow; two University presidents have "signed into law" Iron Arrow's constitution and amendments to it. Iron Arrow is the only campus organization that holds a charter granted by the University. While the University no longer provides secretarial and mailing services or meeting facilities to the Society, nothing indicates that faculty members no longer serve on membership screening committees in all of the colleges, except the law school. In addition, many plaques and monuments around the campus pay tribute to Iron Arrow and its members, recognizing the Society as "the highest honor at the University of Miami."[3]

Iron Arrow sought to enjoin the Secretary from terminating federal funding to the University. In our previous opinion, we affirmed the district court's denial of a permanent injunction. *See* 499 F.Supp. 496 (S.D.Fla.1980). In reaching this conclusion, we made two findings. First, we found that the HEW regulation upon which the Secretary acted, Reg. 86.31(b)(7) (1975), 40 Fed.Reg. 24128,[4] "effectuates" the provisions of Title IX and is consistent with the achievement of the objectives of that statute. Second, we found that, in light of the close history of the Society and the Univer-

---

**1.** The Department of Health, Education and Welfare's responsibilities for educational institutions under Title IX were transferred to the Department of Education by § 301(a)(3) of the Department of Education Organization Act, Pub.L. No. 96–88, 93 Stat. 668, 678 (1979). The Department of Health, Education and Welfare was then reorganized as the Department of Health and Human Services. This opinion will refer to the appropriate party defendant as simply the "Secretary."

**2.** The University of Miami received $46,000,000 of federal funds in 1980, in the form of contracts, grants, and student assistance.

**3.** The most prominent of these monuments is on a mound outside the student union building. At the time the Secretary initiated his administrative action against the University, Iron Arrow conducted its "tapping" ceremony by removing "tapees" from class and conducting a highly visible ceremony on the mount.

**4.** The regulation, originally codified as 45 C.F.R. § 86.31(b)(7) (1975), has since been codified as 34 C.F.R. § 106.31(b)(7) (1982) in connection with the establishment of DOE, 45 Fed. Reg. 30802 (1980).

sity, continuing tangible and non-tangible support of the Society by the University constitutes adequate assistance to impute fairly Iron Arrow's sex discrimination practices to the University itself.

We now must reconsider our conclusions in light of the "program-specific" language in the Supreme Court's *North Haven* decision. We face the issue of the validity of the HEW regulations implementing Title IX and the Secretary's interpretation of several key phrases of these regulations. To assist us in this task, we requested briefs from the parties within 60 days. The Society and amicus Women's Commission of the University of Miami complied with our request. The Secretary failed to brief the substantive issues but filed a Motion for Suggestion of Mootness and a Motion for Remand. Iron Arrow responded by vigorously opposing this motion. We turn first to the mootness question before reaching the substantive issues.

## II. MOOTNESS

The Secretary refers the Court to the letter dated September 23, 1982, of University President Edward T. Foote, II to C. Rhea Warren, Iron Arrow's Chief. That letter expresses the new policy of the University's Board of Trustees that it will not permit Iron Arrow to resume its discriminatory practices on campus even if Iron Arrow succeeds in this lawsuit. This letter presumably refers to the policy adopted by the Trustee Executive Committee on July 15, 1980, setting forth the requirement that Iron Arrow may only return to campus if it meets the code for student organizations, which includes a policy of non-discrimination. The Secretary, joined by amicus, contends that Iron Arrow's injury is attributable solely to the University's decision to keep it off the campus, and not to any action by the Department of Education or any possible action by this Court.

■ In determining whether this case still presents a justiciable Article III case or

controversy, we must assess whether the Court may effectively render the relief requested by the appellant. *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895).[5] It is important to bear in mind that, while the University is the defendant in the administrative action that provided the stimulus for this lawsuit, Iron Arrow is the plaintiff which has requested injunctive relief and whose policies form the basis for the Secretary's actions. We, therefore, must consider whether enjoining the Secretary from cutting off federal funding to the University would result in any benefit to Iron Arrow.

■ This case continues to present a live controversy. First, we find that we may still grant the plaintiffs effectual relief. The Secretary still could require, for the University to be found in compliance with Title IX, that the University take more substantial steps than merely prohibiting Iron Arrow from using campus facilities for its "tapping" ceremony. The Secretary conceivably could demand that the University, in addition to its stated policy, disestablish the historical ties between it and Iron Arrow by, *inter alia,* revoking the charter given by the University to the Society, refusing to recognize Iron Arrow any longer, withdrawing "sponsorship" of Iron Arrow by the office of the president, and prohibiting Iron Arrow from using the University's name. An injunction would serve to insulate the plaintiffs from all of these appropriate additional enforcement actions should we, for example, uphold the validity of the HEW regulation but find that the Secretary's application of the regulation in this particular instance is improper.

The second reason this case continues to present a live controversy is, quite simply, because the University's present policies display no assurances of permanence. We note that the University's policy of excluding Iron Arrow from campus, even if adopted in good faith, is subject to change at a

---

**5.** We note that, in evaluating the mootness of a case pending on appeal from a lower court, we are empowered to consider extrinsic evidence

not appearing on the record. *Mills,* 159 U.S. at 653, 16 S.Ct. at 133.

later date. The present trustee policy barring Iron Arrow from campus while the Society maintains discriminatory membership practices itself reflects a shift from University policy adopted April 11, 1977,[6] and thus indicates that such policy statements are readily changeable.[7] A long line of Supreme Court cases supports the proposition that the "[v]oluntary discontinuance of an illegal activity does not operate to remove a case from the ambit of judicial power." *Walling v. Helmerich & Payne,* 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944). *E.g., St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 537–38, 98 S.Ct. 2923, 2927–28, 57 L.Ed.2d 932 (1978); *United States v. Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (heavy burden of persuasion where voluntary discontinuance); *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Hecht Co. v. Bowles,* 321 U.S. 321, 327, 64 S.Ct. 587, 590, 88 L.Ed. 754 (1944).[8] *Also see Otis & Co. v. SEC,* 106 F.2d 579, 583–84 (6th Cir.1939). We are bound by another panel of this Circuit, which recently offered the following advice in this regard: "Courts should keep in mind the oft-repeated observation that 'reform timed to anticipate or blunt the force of a lawsuit offer[s] insufficient assurance that the practice sought to be enjoined will not be repeated.'" *NAACP v. City of Evergreen, Alabama,* 693 F.2d 1367, 1370 (11th Cir., 1982), *quoting James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 354–55 (5th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct.

767, 54 L.Ed.2d 781 (1978). We thus feel free to proceed to a reconsideration of the merits of this appeal. Appellees' Motion for Remand is denied.

## III. RECONSIDERATION IN LIGHT OF North Haven

### A. *The Statute and HEW's Regulation*

Section 901(a) of Title IX of the Education Amendments of 1972 provides that, "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a). Congress gave federal agencies the power to enforce this prohibition by authorizing regulations which may include a fund cutoff provision. Section 902 provides, in pertinent part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract ... is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with the statute authorizing the financial assistance in connection with which the action is taken.... Compliance with any requirement adopted pursuant to this section may be effected (1) by termination or refusal to grant or to continue assistance

---

**6.** The April 11, 1977, policy of the Board of Trustees Executive Committee would have permitted Iron Arrow back on campus so long as such action was legally permissible, even if the Society continued to elect only men to membership.

**7.** Moreover, the reluctance of the Secretary to enforce the regulation under attack does not moot this litigation because the regulation still is in effect. *See North Haven,* 102 S.Ct. at 1918, n. 12.

**8.** The case of *SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), relied upon by appellees, is not persuasive here. That case against the Securities and Exchange Commission for fail-

ure to oppose a third party corporation's exclusion of a shareholder proposal was mooted not solely, as appellees suggest, because the corporation later decided to include the proposal in its proxy statement. Rather, the Court relied upon a finding of fact that Dow would not seek to exclude the proposal challenging production of napalm when the shareholders were permitted by the security laws to resubmit it in three years, because the proposal gained such little support the first time it was included in the corporation's proxy statement. We also note that we do not rely upon the "capable of repetition but evading review" line of cases in denying appellees' motion, because it is factually inappropriate in the instant case.

under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the ... recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such non-compliance has been so found.... Provided however, that no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

20 U.S.C. § 1682.

Pursuant to this authority, HEW issued regulations in 1974. Regulation 86.31(b)(7) provided the basis for the Secretary's threatened cutoff of federal funds at the University of Miami. That Regulation provides, in pertinent part:

A recipient shall not, on the basis of sex:

...

(7) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees.

40 Fed.Reg. 24128 (1975). The Secretary explained the purpose and function of this Regulation on "outside" organizations:

Section 86.31(b)(7) prohibits a recipient from assisting another party which discriminates on the basis of sex in serving students or employees of that recipient. This section might apply, for example, to financial support by the recipient to a community recreational group or to official institutional sanction of a professional or social organization. Among the criteria to be considered in each case are the substantiality of the relationship between the recipient subject to the regulation and the other party involved, including the financial support by the recipient, and whether the other party's activities relate so closely to the recipient's educational program or activity, or to students or employees in that program, that they fairly should be considered as activities of the recipient itself. (Under section 86.-6(c), a recipient's obligations are not changed by membership in any league or other organization whose rules require or permit discrimination on the basis of sex).

39 Fed.Reg. 22229 (1974). HEW also described in the Federal Register some additional standards which would guide its enforcement of Regulation 86.31(b)(7):

[S]uch forms of assistance as faculty sponsors, facilities, administrative staff, etc. may be significant enough to create the nexus and to render the organization subject to the regulation. Such determinations will turn on the facts and circumstances of specific situations.

40 Fed.Reg. 24132 (1975).

It should be noted that the statute itself fails to define the terms "education program or activity." Section 901(c) of the statute does define the term "educational institution," [9] as follows:

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institu-

---

**9.** The term "institution" is used throughout the exceptions to Title IX. Section 901(a)(1) provides that, with respect to admissions, section 901(a) applies only to institutions of vocational education, professional education, and graduate higher education, and to institutions of undergraduate higher education. Specific exceptions are made for the admissions policies of schools that begin admitting students of both sexes for the first time, section 901(a)(2); religious schools, section 901(a)(3); military schools, section 901(a)(4); the admissions poli- cies of public institutions of undergraduate higher education that traditionally and continually have admitted students of only one gender, section 901(a)(5); social fraternities and sororities, and voluntary youth service organizations, section 901(a)(6); Boys/Girls State/Nation conferences, section 901(a)(7); father-son and mother-daughter activities at educational institutions, section 901(a)(8); and scholarships awarded in "beauty" pageants by institutions of higher education, section 901(a)(9).

tion composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department. 20 U.S.C. § 1681(c).

In our initial consideration of this case, we interpreted these comments to mean that, while the sanction of a cutoff of federal funds normally is limited to a recipient's discriminatory program or activity directly receiving federal funds, a different standard applies where an "outside organization" is involved. In such a case, we found it necessary to consider the substantiality of the relationship between a university and the outside party and whether that party's activities relate so closely to a university's educational program or activity, or to students or employees in that program, that these activities should be considered as activities of a university itself for the purpose of terminating federal funding.

We now turn our attention to the effect of the Supreme Court's decision in *North Haven* on our previous holding that the Secretary properly exercised his authority under Title IX when he (1) promulgated Regulation 86.31(b)(7) and (2) applied the Regulation to compel the University to disassociate itself from the Society so long as Iron Arrow maintains its all-male membership policy or face a termination of federal funds.

 After careful study, we now determine that the case law, including the *North Haven* decision, strongly supports our prior conclusion that Regulation 86.31(b)(7) is valid both on its face and as applied. Each and every federal program at the University is necessarily discriminatory as a result of Iron Arrow's relationship to the University. The discriminatory practices of the Society, by their nature and in light of the intertwined histories of Iron Arrow and the University, infect the entire academic mission of the University. In reaching this conclusion, it is immaterial that federal funds are not directly earmarked to Iron Arrow itself. The effect of the program-specific requirements of *North Haven* is that, while the University as a whole is not

subject to the prohibitions and sanctions of Title IX, each and every program or activity at the University receiving federal assistance is so subject to the statute's strictures. We also find that the statutory language and the statute's pre-enactment and post-enactment legislative history bear out our conclusion that Congress intended that Title IX cover honor societies such as Iron Arrow.

### B. The *North Haven* Decision

In *North Haven,* the Supreme Court upheld the validity of regulations that prohibit federally funded educational programs from discriminating in employment on the basis of gender. In applying this conclusion to the specific facts in the *North Haven* case, the Court noted that Title IX is "program-specific" both in its prohibition of gender discrimination and in its fund cutoff sanction. Thus, the Court left little doubt that Title IX applies to those programs or activities directly receiving federal funds.

The Court's decision, however, leaves open several questions for this Court. For example, the Court explicitly recognized that it did "not undertake to define 'program' ..." 102 S.Ct. at 1927. Thus, may the term "program" encompass outside activities such as Iron Arrow if the activities are considered as programs of the University itself? Also, who falls within the definition of a "recipient" of federal funding? In addition, we still must determine the means by which federal funding may "benefit" a program that engages in discrimination.

### C. *Analysis*

Appellants, on remand, contend that the program-specific language of *North Haven* requires the "tracing" of federal money to a specific university program which then, in turn, benefitted Iron Arrow, for the University to be subjected to Title IX's sanctions. They argue that neither Iron Arrow nor the University has "kept one penny of federal financial assistance from being available to the women students at the University as much as to the male students there." Appellants rely on three cases,

each dealing with sports programs at schools, to support their proposition that Title IX applies only to those programs receiving direct federal funding. Amicus, on the contrary, argues that the legislative history requires that the term "program or activity" be read broadly so as to include honorary societies. Amicus also relies on several cases which employ various theories to broaden the definition of "recipient" or "program" under Title IX.

*North Haven* provides a framework for the analysis of the scope of Title IX. In that case, the Court looked first to the language of the statute, then to the legislative history, both from before and since Title IX's enactment, and finally to the case law to determine if employment discrimination falls within the ambit of Title IX. We employ this same approach here.

### 1. The statute

We now have the benefit of the Supreme Court's ruling in *North Haven* that an agency's authority under Title IX both to promulgate regulations and to terminate funds is limited to the specific program or activity receiving federal financial aid. The statute fails on its own to define unambiguously the terms "program or activity" or "recipient." We therefore must turn to the legislative history for a clearer understanding of the boundaries of these terms.

Nothing in the language of the statute itself, however, indicates that Iron Arrow's activities should not be attributable to the University and thus be subject to Title IX. We especially note that Congress did not limit its prohibition merely to discrimination in entrance to funded programs or to discrimination among actual participants in those programs. The language of Title IX sweeps far more broadly. In addition to the language, "excluded from participation in" and "subjected to discrimination under," Congress also used the broad phrase "be

denied the benefits of." Not only does the word "benefit" allow for the prohibition of many subtle substantive forms of discrimination, the act of "denial" is so unspecific as to admit of a host of prohibited actions. We also believe it significant that Congress did not provide in the statute that the "education program or activity receiving Federal financial assistance" be the actual party which engages in the discriminatory act.

The statute also is revealing for the exceptions it contains.[10] These exceptions fall roughly into two classes. The first class excepts from Title IX's coverage the admissions policies of certain types of schools that do not admit students of one or the other sex or that admit only a limited number of male or female students. The second class excepts from coverage certain activities or organizations in otherwise covered schools. The existence of these exceptions is significant to understanding the scope of § 901(a). Congress would not have provided such exceptions unless it believed that the activities or policies, in the absence of these exceptions, would otherwise have been covered. Thus, for example, *social* fraternities are specifically excepted from coverage, even without any clear indication of the *direct* federal funding they would receive.[11] Similarly, Congress felt it necessary to except certain admissions policies even though admissions programs are themselves rarely federally funded. These exceptions indicate Congress' contemplation of a broad reading of Title IX and its "program-specific" requirements that would apply to general and overriding features of all educational institutions.[12]

### 2. Pre-enactment legislative history

If the pre-enactment legislative history of Title IX reveals anything, it is that Congress did not expressly contemplate the type of problem that is before us today.

---

10. *See* footnote 9.

11. *See Haffer v. Temple University,* 524 F.Supp. 531, 541, *aff'd* 688 F.2d 14 (3d Cir. 1982), where the court also relies on this argument.

12. *See* section III, C, 3, on post-enactment legislative history, *infra,* for further discussion of these exceptions.

Two factors are important in considering the pre-enactment legislative history of Title IX. First, Title IX was presented as a floor amendment, so there is no informative committee consideration. Second, Title IX was explicitly modeled after and contains virtually identical language to sections 601 and 602 of Title VI of the Civil Rights Act of 1964, Pub.L. 88–352, 78 Stat. 252, 42 U.S.C. §§ 2000d *et seq.*, which addresses race discrimination in all phases of federally funded programs, not merely in education. *North Haven,* 102 S.Ct. at 1922; *Cannon v. University of Chicago,* 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979); *Sex Discrimination Regulations: Hearings Before Subcommittee on Post Secondary Education of the Committee on Education and Labor,* House of Representatives, 94th Cong., 1st Sess. 16, at 150 ("[T]he setting up of an identical administrative structure and the use of virtually identical statutory language substantiates the intent of Congress that the interpretation of Title IX was to provide the same coverage as had been provided under Title VI.") (Comments of Senator Bayh). ("Sex Discrimination Hearings.") Thus, the legislative history of Title VI is useful in understanding Congress' intent when it enacted Title IX, although we recognize that it is obviously, "Congress' intention in 1972, not 1964, that is of significance in interpreting Title IX." *North Haven,* 102 S.Ct. at 1922.

The so-called "pinpoint" provision of section 602 of Title VI, which permits the cutoff of federal funds only in the federally supported program or activity that is actually found to be engaged in race discrimination, was designed to balance the need to prevent federal monies from being used to advance discrimination, *Lau v. Nichols,* 414 U.S. 563, 565, 94 S.Ct. 786, 788, 789, 39 L.Ed.2d 1 (1974), against the fear that fund cutoffs would be exercised in a vindictive or punitive manner. *E.g.* 110 Cong.Rec. 7062 (1964) (Comments of Senator Pastore). Several senators harbored this fear, especially with regard to fund cutoffs for segregated public school systems.[13] They feared that funds to an entire state could be terminated if only a single school remained segregated and that innocent beneficiaries of federal funds would thus be adversely affected.[14] The need to pinpoint the termination of funds to the particular discriminating program was envisioned as an essentially geographic limitation, yet with broad applicability to prohibit the use of federal funds for discriminatory purposes.[15]

**13.** For a discussion of the history of the "pinpoint" provision, *see generally, Board of Public Instruction v. Finch:* Unwarranted Compromise of Title VI's Termination Sanction, 118 U.Pa.L.Rev. 1113 (1970); Title VI, Title IX and the Private University: Defining "Recipient" and "Program or Part Thereof," 78 Mich.L.Rev. 608 (1980); Administrative Cutoff of Federal Funding under Title VI: A Proposed Interpretation of "Program," 52 Ind.L.J. 651 (1977); Federal Aid to Higher Education: the Challenge to Fraternal Freedom of Association, (1966) Wis. L.Rev. 1252; HEW's Regulations under Title IX of the Education Amendments of 1972: Ultra Vires Challenges, 1976 Brigham Young University L.Rev. 133 (1976).

**14.** *See, e.g.* 110 Cong.Rec. 8507–08 (1964) (Comments of Senator Smathers) (Title VI, "would punish a whole area, a whole state, a whole group, because of the sins of one.").

**15.** *See, e.g.,* 110 Cong.Rec. 11942 (1964) (Comments of Attorney General Kennedy); *id.* at 7063 (Comments of Senator Pastore); *id.* at 6067 (Comments of Senator Ribicoff); *id.* at 8979–80 (Comments of Senator Humphrey).

The breadth of congressional concern is indicated by the following list of abuses of federal funds towards which Title VI was aimed:

The Federal Government pays more than ninety-five percent of all National Guard operating funds, yet eleven states still require segregation in their Guard units.

The Federal Government gives the State of Mississippi about two million dollars a year for its public schools, yet every public school in the State continues to be segregated ten years after the Supreme Court school decision.

The Federal Government spent seven hundred fifty million dollars on research projects in 1960, yet in seven States forty-three percent of all National Institutes of Health grants and forty-one percent of all grants by the Atomic Energy Commissioner went to public universities and research centers that do not admit Negro students.

State public offices are financed one hundred percent by the Federal Government, nevertheless many offices maintain separate buildings, separate waiting rooms and separate job lists.

We note that Title IX's legislative history indicates that Congress explicitly contemplated coverage of at least one of the types of harms suffered by the women who originally complained to the Secretary. There is substantial evidence in the record that future employers often regard membership in Iron Arrow as a very desirable attribute. Senator Bayh, Title IX's sponsor, noted the effect of educational opportunities on future employment. He identified the need for a, "fair chance [for women] to secure the jobs of their choice . . . ," 118 Cong.Rec. 5808 (1972), as a significant motivation for enacting Title IX.

In sum, Title IX's pre-enactment legislative history is inconclusive with respect to whether Congress actually envisioned imputing the practices of "outside organizations" to federal fund recipients. The history does indicate two general principles. First, that in limiting an administrator's authority to cut off federal funds, Congress was concerned about abuses of the termination sanction that are very different from the Secretary's actions in the instant case. Thus, there is no indication that the "pinpoint" provision was designed to prohibit the Secretary from pursuing the type of sanctions he seeks to impose in this case. Second, Congress clearly intended that Title VI's and Title IX's prohibitions apply whenever federal funds bestow a benefit in a discriminatory manner. Included amongst those benefits are equal employment opportunities for women as a result of equal educational opportunities.

110 Cong.Rec. 7711 (1964) (Quoting from Leadership Conference on Civil Rights).

**16.** This 45 day period had already run by the time that Congress amended 20 U.S.C. § 1232(d)(1) to provide that:

Failure of the Congress to adopt such a concurrent resolution with respect to any such final regulation prescribed under any such Act, shall not represent, with respect to such final regulation, an approval or finding of consistency with the Act from which it derives its authority for any purpose, nor shall such failure to adopt a concurrent resolution be construed as evidence of an approval or finding of consistency necessary to establish

### 3. Post-enactment legislative history

Title IX's post-enactment legislative history offers significant insight to the problem we face. Several amendments and proposed amendments, as well as formal consideration of the HEW regulations, confirm Congress' desire to ban discrimination in those honor societies with an adequate nexus to universities receiving federal funds.

HEW published its final Title IX regulations on June 4, 1975. The Secretary submitted these regulations to Congress for review pursuant to section 431(d)(1) of the General Education Provisions Act, Pub.L. 93–380, 88 Stat. 567, as amended, 20 U.S.C. § 1232(d)(1). This "laying before" provision was designed to afford Congress an opportunity to examine the regulation and, if it found the regulation "inconsistent with the Act from which it derives its authority . . . ," to disapprove it in a concurrent resolution. If no such disapproval was adopted within 45 days, the regulation would become effective.[16]

Two resolutions of disapproval were introduced in the Senate, but neither was acted upon. *See* 121 Cong.Rec. 17300 (1975) and *id.* at 22940. One of these, Senate Concurrent Resolution 46, proposed by Senator Helms, would have disapproved regulations applying Title IX to programs and activities not directly receiving federal funds. The resolution was not reported out of committee. Similarly, the House failed to pass concurrent resolutions of disapproval. *See* 121 Cong.Rec. 21687. Congress thus failed to register its dissatisfaction with the regulations in question in this case.

a prima facie case, or an inference or presumption, in any judicial proceeding.

Section 8(a)(b) of Public Law 94–142 provides that section 7(b), which amended 20 U.S.C. § 1232(d)(1), was to take effect on November 24, 1975. While the failure of resolutions of disapproval in the absence of this amendment cannot be read to mean that Congress explicitly approved the new regulations or explicitly found them to be consistent with Title IX, we note that many members of Congress were obviously aware that their actions indeed would be construed as an implicit finding of consistency.

As the Supreme Court in *North Haven* noted, "[T]he relatively insubstantial interest given the resolutions of disapproval that were introduced seems particularly significant since Congress has proceeded to amend section 901 when it has disagreed with HEW's interpretation of the statute." 102 S.Ct. at 1924 (footnote omitted).

Five attempted amendments to Title IX merit our careful attention. These amendments reveal that Congress contemplated the problem of Title IX's coverage of outside organizations, including honor societies such as Iron Arrow, and that Congress did not act to prevent such an extension of HEW's authority under Title IX. In the only one of these five proposed amendments actually adopted, Congress amended Title IX, even before it reviewed HEW's regulations, to except social fraternities and sororities and voluntary youth service organizations from the reach of section 901(a). Pub.L. 93–568, § 3(a), 88 Stat. 1862 (1974). Senator Bayh, the sponsor of the amendment, emphasized that:

> This exemption covers only social Greek organizations; it does not apply to professional fraternities or sororities whose admission practices might have a discriminatory effect on the future career opportunities of a woman.

120 Cong.Rec. 39992 (1974).

This amendment clarifies two aspects of Congress' thinking.[17] First, it is strong evidence that Congress intended that Title IX apply to outside organizations such as Iron Arrow, which might affect the post-graduation employment opportunities of women.

Second, it is difficult to imagine, except in a very few cases where a fraternity or sorority might occupy a house in which construction was paid for in some part by federal funds, any sort of direct federal aid such an organization could receive. Yet this fact did not deter Congress from believing that, unless fraternities and sororities were specifically excepted from the coverage of Title IX, their discriminatory admissions policies would fall within the ambit of section 901(a).[18]

In 1975, Senator Helms attempted to limit explicitly Title IX's coverage to educational programs and activities directly receiving federal financial assistance. S. 2146, 121 Cong.Rec. 23845 (1975). Congress declined to pass this amendment. In 1976, Senator McClure similarly attempted to define federal financial assistance as assistance received directly from the federal government. Amendment 390, 122 Cong. Rec. 28144 (1976). The Senate defeated this amendment. Senator McClure also attempted to amend section 901 to limit the meaning of "educational program or activity" to such "as are curriculum or graduation requirements of the institutions." Amendment 389, 122 Cong.Rec. 28136 (1976). This amendment arguably would have placed Regulation 86.31(b)(7) beyond the Secretary's authority under Title IX. The Senate, by a vote of 52 to 28, declined to so limit the scope of Title IX's prohibitions. 122 Cong.Rec. 28147 (1976).

In 1976, Representative Mathis unsuccessfully attempted to broaden an amendment containing certain exceptions to Title IX,

---

**17.** It is useful to note, in divining Congress' intent by examining a post-enactment amendment to a statute, the substantial continuity of membership from the 92nd to the 94th Congress. *See* 1976 Brigham Young U.L.Rev. 133.

**18.** *See Haffer,* 524 F.Supp. at 541 ("Logic supports a broad reading of Title IX and supports upholding the validity of the regulations. Congress explicitly amended Title IX to exclude social fraternities and sororities from its coverage. I cannot imagine what possible federal funds could have been earmarked for these programs. If such indirectly (if at all) benefitted programs were never intended to be cover-

ed by Title IX, it is inexplicable that Congress felt the need to exempt them specifically on another basis.")

We emphasize at this point that Congress was well aware that these social fraternities or sororities might only receive *indirect* federal funding. In the course of the amendment's debate, Senator Bayh stated that, "Most of these fraternal organizations could not continue to exist without this kind of *indirect* financial assistance from the colleges and universities...." 120 Cong.Rec. 3992 (1974) (emphasis added).

specifically sections 901(a)(6) to (9),[19] by also excepting professional fraternities and sororities from the coverage of Title IX. In response to inquiry on the scope of his proposed amendment, Representative Mathis clearly stated that honorary societies would remain subject to Title IX. 122 Cong.Rec. 13535 (1976). In addition, several other representatives strongly denounced the policy behind Representative Mathis' proposed amendment and noted that the discriminatory membership practices of such socities were among the abuses Title IX was designed to remedy. *See* 122 Cong. Rec. 13535–36 (1976).

These numerous attempts to alter Title IX's scope of coverage reveal that Congress was well aware that Title IX would be construed to prohibit discriminatory membership practices among honor societies such as Iron Arrow. We take these expressions of Title IX's scope as authoritative, in light of the recent language of the Supreme Court in *North Haven* that:

> Although postenactment developments cannot be accorded "the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX...." *Cannon v. University of Chicago,* 441 U.S., at 687, note 7 [99 S.Ct. at 1952, note 7]. Where "an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *United States v. Rutherford,* 442 U.S. 544, 554, note 10 [99 S.Ct. 2470, 2476, note 10, 61 L.Ed.2d 68] (1979), quoting *Apex Hosiery Co. v. Leader,* 310

U.S. 469, 489 [60 S.Ct. 982, 989, 84 L.Ed. 1311] (1940). . . .

102 S.Ct. at 1925.

### 4. *The relevant case law*

The relevant case law strongly supports our prior finding that the Secretary acted within his authority when he issued Regulation 86.31(b)(7) and when he determined that the University is subject to a cutoff of federal funding due to its relationship with Iron Arrow. In reaching this decision, we rely primarily upon the case of *Board of Public Instruction of Taylor County, Florida v. Finch,* 414 F.2d 1068 (5th Cir.1968), by which we are bound.[20] In *Finch,* the former Fifth Circuit interpreted the term "program" in section 602 of Title VI to mean the use of federal funds under an individual grant statute by which the school received aid to remedy specific areas of educational need. 414 F.2d at 1078.[21] The court held that a general finding of discrimination in the operation of an elementary and secondary school system is insufficient, for the termination of all federal funding to that system because, "the termination power reaches only those programs which would utilize federal funds for unconstitutional ends." 414 F.2d at 1078. The Court found that HEW must make a finding of discrimination in the operation of each program funded by a particular statute before cutting off federal funds.

The *Finch* court went on to recognize that the policy of Title IX mandates the broad and flexible application of the fund cutoff provisions:

> We conclude with a word of caution. In finding that a termination of funds under Title IV (sic) of the Civil Rights Act must be made on a program by program basis, we do not mean to indicate that a program must be considered in

---

**19.** *See* footnote 9, *supra.*

**20.** The case law of the former Fifth Circuit Court of Appeals has been adopted by the Eleventh Circuit Court of Appeals as binding precedent unless and until overruled or modified by this Court sitting en banc. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

**21.** This interpretation is applicable to Title IX because of the virtually identical language of that statute. *See North Haven,* 102 S.Ct. at 1922 ("the meaning and applicability of Title VI are useful guides in construing Title IX, therefore, only to the extent that the language and history of Title VI do not suggest a contrary interpretation."); *Cannon v. University of Chicago,* 441 U.S. at 697–98, 99 S.Ct. at 1958.

isolation from its context. To say that a program in a school is free from discrimination because everyone in that school is at liberty to partake of its benefits may or may not be a tenable position. Clearly the racial composition of a school's student body, or the racial composition of its faculty may have an effect upon the particular program in question. But this may not always be the case. In deference to this possibility, the administrative agency seeking to cut off federal funds must make findings of fact indicating either that a particular program is itself administered in a discriminatory manner, or is so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory.

414 F.2d at 1078–79. Thus, under the standards set out by the Court, if federal funds, "support a program which is infected by a discriminatory environment, then termination of such funds is proper." 414 F.2d at 1078.

We hold, therefore, that the existence of the all-male Iron Arrow Honor Society as the most prestigious honorary-recognition society at the University has a pervasive discriminatory effect upon women in all of the University's academic programs, federally funded or not. All federal programs at the University of Miami are necessarily infected by what amounts to a general and overriding policy of the University. This infection results from the University's close historical ties with Iron Arrow.

The Supreme Court has recognized that, "[a] sense of inferiority affects the motivation of a child to learn." *Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Two factors aggravate this concern with respect to Iron Arrow. First, evidence indicates that a central tenet of the Society's philosophy is the public peer recognition that membership should command. The obviousness of Iron Arrow's ceremonies, such as its "tapping" or the tradition that new initiates wear certain Indian jackets, insures that all members of the campus community are aware upon whom the honor of membership has been bestowed. Second, Iron Arrow's membership is not limited to students, but also includes alumni, staff, faculty members, and university administrators. Thus, the suggestion that the contributions, efforts, and achievements of women can never rise to the level of male accomplishments on campus necessarily infects the academic atmosphere of the entire University. We are unable to imagine a single federal program which, even though on its face administered in a non-discriminatory manner, escapes the taint of this discrimination.

It is precisely because Iron Arrow purports to represent the best at the University in terms of achievement and because it in fact commands so much respect among members of the campus community that the effects of the Society's discriminatory practices are so pervasive and so pernicious. We are disturbed that the University community, which in theory premises relations among its members upon the free and vigorous interplay of ideas, should classify and stigmatize the quality of those ideas solely because of the sex of their author, whether male or female.[22]

**22.** Consider, for example, a woman chemistry professor who secures a federal contract to support her research and hires several graduate students as assistants. In such a program, which is not directly related to teaching, the motivation of this professor in conducting her research and the motivation of her female research assistants may be adversely affected, in a subtle manner, because they know that the University community will never formally recognize and accept, through the mechanism of the Iron Arrow Society, that their work is of the same quality as that of male students or faculty.

In our previous opinion, we noted that:
While we do not reach the ultimate question as to what, if anything, would be done by the University to completely withdraw assistance from Iron Arrow in order to bring itself into compliance without abandoning its males-only policy, we conclude that we are unable to imagine any continued association with the University of Miami that, in light of its history, would not constitute a continuation of the "substantial assistance" which the trial court found to exist.

In its *North Haven* decision, the Supreme Court quotes approvingly from HEW's Title IX regulations and from the *Finch* decision, upon which we rely. The Supreme Court stated that:

The Department [HEW] recognized that section 902 limited its authority to terminate funds to particular programs that were found to have violated Title IX, and it continued:

"Therefore, an education program or activity or part thereof operated by a recipient of federal financial assistance administered by the Department will be subject to the requirements of this regulation if it receives or benefits from such assistance. This interpretation is consistent with the only case specifically ruling on the language contained in Title VI, which holds that Federal funds may be terminated under Title VI upon a finding that they are 'infected by a discriminatory environment . . .' *Board of Public Instruction of Taylor County, Florida v. Finch,* 414 F.2d 1068, 1078–79 (5th Cir.1969)." 40 Fed.Reg. 24128 (1975).

By expressly adopting the Fifth Circuit opinion construing Title VI as program-specific, HEW apparently indicated its intent that the Title IX regulations be interpreted in like fashion. So read, the

regulations conform with the limitations Congress enacted in sections 901 and 902. 102 S.Ct. at 1927 (footnote omitted).

■ Thus, we find that the Supreme Court's opinion in *North Haven* directly supports our broad reading that the program-specific prohibition of Title IX applies when a discriminatory program is "benefitted" by federal financial assistance or when a federally assisted program itself is infected by a discriminatory environment.[23]

In assessing the impact of Iron Arrow's male-only policy upon the University community, we are of the belief that its effect upon women is most analogous to that of a discriminatory admissions policy at an educational institution. While a discriminatory admissions policy precludes women from all of the benefits of educational programs, Iron Arrow's practices more subtly undermine the self-worth of women who participate in these programs. Both, however, share the same general pervasive effect upon a university community and neither Iron Arrow nor an admissions program is usually the direct recipient of federal dollars. Since many courts and Congress have consistently condemned discriminatory admissions policies,[24] we adopt their analyses in further support of our conclusion.

Title VI originally proscribed racial discrimination in higher education only with respect to admissions. 42 U.S.C. § 2000c–

652 F.2d at 448. In light of this statement, and since in any federal contract a school captures some portion of the funds to support its overhead, including the central administration and very often expenses such as student activities, Iron Arrow benefits from the federal support that the Office of the President directly received as a result of the allocation of overhead from federal contracts. Because of our broader holding that each federally assisted program at the University is necessarily discriminatory, it is unnecessary for us to determine the impact of Title IX's program-specific sanctions upon the direct federal support from overhead received by general administrative entities such as the University's Office of the President.

**23.** Congress explicitly relied upon the same language from the *Finch* decision when it reviewed the HEW regulations for their consistency with Title IX. *See* Sex Discrimination Hearings at 188–89.

We also note the need to defer to agency expertise in construing a statute when that agency is charged with the statute's administration. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, [1761–62] 40 L.Ed.2d 134 (1974); Sands, 2A Sutherland's Statutes and Statutory Construction, § 49.05 at 238 (4th ed. 1973). While the Supreme Court in *North Haven* recognized the same principle, the Court did not rely on this analysis because of the agency's fluctuating interpretations of the employment portion of HEW's regulations. *See* 102 S.Ct. at 1927, n. 29. Since the Secretary has consistently applied Regulation 86.-31(b)(7), we do not face a similar restriction in relying upon the agency's interpretation.

**24.** *See* note 9, *supra,* for Title IX's exceptions to prohibitions against discriminatory admissions. These exceptions are due to historical concerns and do not undermine our general discussion about admissions, which follows.

6(a)(2) (1964). A college student was protected from discrimination only if he or she was denied admission or was not permitted to continue attending a public college. Discriminatory facilities, such as segregated dormitories or classrooms, were not by themselves grounds for action unless they rose to the level of an admissions decision by forcing the student to discontinue attendance at a school. *See* 1966 Wis.L.Rev. 1252, 1256.

Congress extended its concern with admissions to cases of sex discrimination when it adopted Title IX. During Congressional evaluation of HEW's regulations, Senator Bayh, Title IX's author, forwarded a legal opinion which reveals that Congress was well aware of the interpretation we impart to HEW's Regulation. The opinion stated that admissions and similar policies of a general pervasive nature "unavoidably" infect each assistance program or activity and are thus covered by Title IX:

> The proposed regulations arguably reflect a position on the part of the agency that, for purposes of determining compliance, the educational activities of institutional recipients may, where general admissions policies are concerned, be viewed as an individual entity. Where less pervasive forms of discrimination are involved, however, the regulations seem to contemplate a program by program approach to coverage.... Whole fund cutoffs ... are apparently limited by the regulations, however, to cases involving admissions policies or other pervasive practices affecting all assisted programs or activities conducted by the institution.[25] Letter to Honorable Birch Bayh from Barbara Dixon, American Law Division, Library of Congress, Dec. 20, 1974, Sex Discrimination Hearings at 188–91.

Courts adopting a narrow reading of the programmatic prohibitions of Title IX consistently have conceded the inapplicability of their analysis to an institution's pervasive practices that go beyond discrete academic or non-academic programs, when they have addressed the issue. For example, in *Rice v. President & Fellows of Harvard College,* 663 F.2d 336 (1st Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (April 20, 1982), the court dismissed appellant's complaint alleging sex discrimination in the awarding of grades and other matters at Harvard Law School. The court held that the appellant failed to allege discrimination in any specific federally funded programs and that the educational institution itself could not be interpreted as the "program" under Title IX. Yet the *Rice* court noted that a different result would obtain if a pervasive policy such as admissions was challenged. The court stated, "One who is discriminated against in seeking admission is denied access to all educational programs and activities within an institution, and the entire body of programs within the school is tainted." 663 F.2d at 339, n. 2.

Similarly, in *Hillsdale College v. HEW,* 696 F.2d 418 at 428–29 (6th Cir.1982), a case in which students' receipt of federal loans and grants was held to subject only the student loan and grant program itself and not the entire school to Title IX's prohibitions, the court distinguished the case of *Bob Jones University v. Johnson,* 396 F.Supp. 597 (D.S.C.1974), *aff'd* 529 F.2d 514 (4th Cir.1975), on its facts.[26] The *Hillsdale College* court argued that the *Bob Jones* court did not have to face squarely the institutional/programmatic conflict because the *Bob Jones* case involved race discrimination respecting admissions, which tainted all programs and activities within that institution rather than merely a single pro-

---

**25.** While we do not rely on all aspects of the reasoning of the quoted opinion, because we do not explicitly find that the institution as a whole is the relevant program or entity, we note that the opinion placed before Congress the same "pervasive practice" theory which we embrace.

**26.** The *Bob Jones* court held that Bob Jones University is subject to the race discrimination ban of Title VI, 42 U.S.C. 2000d *et seq.,* even though it did not receive any direct federal funding, because several of its students received Veterans Administration benefits that were applied to pay tuition at the school.

gram at the school. Other courts have made this same distinction. *See Othen v. Ann Arbor School Board,* 507 F.Supp. 1376, 1387 (E.D.Mich.1981), affirmed 699 F.2d 309 (6th Cir.1981); *University of Richmond v. Bell,* 543 F.Supp. 321 (E.D.Va.1982).

At this point, it is important to emphasize that we do not rely on what has come to be known as the "benefit theory" or the "institution as program" cases.[27] The "benefit theory" focuses on the type of assistance and argues that federal funds to one program may subject another program to Title IX because these funds "free up" institutional funds for use in non-directly funded discriminatory programs. The related "institution as program" cases focus on the definition of "program" or "recipient" and hold that the entire educational institution may be defined as the program receiving federal assistance for the purposes of Title IX. These theories arise most frequently where student financial aid is used as a device to subject an institution to the proscriptions of Title IX or where a school's athletic programs are allegedly discriminatory. *E.g., Bob Jones; Grove City College v. Bell,* 687 F.2d 684 (3d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983); *Haffer v. Temple University,* 688 F.2d 14 (3d Cir.1982), *affirming* 524 F.Supp. 531 (E.D.Pa.1981); *Wright v. Columbia University,* 520 F.Supp. 789 (E.D.Pa.1981) (handicap discrimination under § 504 of Rehabilitation Act); *Poole v. South Plainfield Board of Education,* 490 F.Supp. 948 (D.N.J.1980) (handicap discrimination under § 504 of Rehabilitation Act). *Contra, Hillsdale College; University of Richmond; Bennett v. West Texas State University,* 525 F.Supp. 77 (N.D.Tex.1981), *reversed,* 698 F.2d 1215 (5th Cir.1981). We note the careful distinction which must be drawn between the statement that an educational program may be *defined* as an educational institution for purposes of Title IX and the portion of our holding which states

that Iron Arrow's practices, because of their centrality to the University's academic mission and the close historical ties between the Society and the University, are *attributable* to the University itself.

Finally, we find that those cases upon which appellants rely for the proposition that the Secretary must directly "trace" federal funds to Iron Arrow to subject the University to Title IX are factually inapposite. *See Othen; University of Richmond; Bennett.* These cases generally deal with the applicability of Title IX to athletics; hence they concern discrete programs which do not affect the entire academic structure of the University.

## IV. CONCLUSION

Education is a unique force in our society for eliminating the effects of past discrimination. Thus, discrimination in education should be examined with a particularly searching light. Congress has determined that no person shall, on the basis of sex, be denied the benefits of or be subjected to discrimination in federally assisted education programs or activities. As the recent *North Haven* case made clear, this ban is restricted to federally funded programs or activities. Yet the net of benefits provided by such activities is cast widely, and the possible discriminatory acts and effects which may subject a program to Title IX's cutoff sanctions are consequently broad.

In this case, Iron Arrow's unique historical affiliation with the University of Miami constitutes "substantial assistance," albeit non-tangible, which subjects the University to termination of federal funds. This is so because the all-male honor society, in light of its renowned reputation, by its very existence unavoidably and necessarily taints each and every federally assisted program at the University. Thus, while the University itself may believe it is acting in a non-discriminatory manner, the effect of

---

**27.** Our non-reliance, of course, should not be taken to indicate our disapproval of these approaches. Nor should our holding, that the discriminatory practices of outside organizations affecting a central and overriding aspect of a university's academic mission are properly attributable to the university itself, be construed as an implicit ruling that practices involving less crucial issues automatically fail to subject a university to Title IX's sanctions.

Iron Arrow's discriminatory practices is such that all the University's programs and activities are, in the end, discriminatory. The practices of Iron Arrow, therefore, are properly attributable to the University for purposes of determining compliance with Title IX.

Since we find that this case continues to present a live controversy, we deny appellees' Suggestion of Mootness and Motion for Remand. Since we also find that the Supreme Court's decision in *North Haven,* because of its reliance upon *Board of Public Instruction v. Finch,* not only permits our approving the Secretary's actions, but compels such a result, and because we also find that the language of Title IX and its legislative history support this conclusion, we reinstate our prior decision in this case, 652 F.2d 445 (5th Cir.1981), that Reg. 86.31(b)(7) is within the scope of the Secretary's authority under Title IX both on its face and as applied. We again affirm the district court's denial of appellants' request for an injunction.

AFFIRMED.

RONEY, Circuit Judge, dissenting:

I respectfully dissent. I would remand the case to the district court for a determination of whether there continues to be a case or controversy in this case. The Women's Commission of the University of Miami filed an amicus curiae brief stating that it considers and reviews "the policies, procedures and attitudes which affect the status of women at the University of Miami, and [makes] recommendations to improve the status of women." Although the brief supports the appellee's position and the conclusion of the majority on the merits, the first point made therein is that "the action should be dismissed because this case no longer presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution." Following is an excerpt of the amicus brief which argues the point:

> During the pendency of this appeal, the University of Miami has categorically stated that regardless of the outcome of these proceedings, Iron Arrow may not associate with the University of Miami unless it registers as a "student organization." To be recognized as a student organization at the University, Iron Arrow must adopt a policy of nondiscrimination on the basis of sex, and therefore must admit female and male members.

> As a result of this independent decision by the University of Miami, this Court can no longer accord Iron Arrow the relief it seeks in this action against the Secretary. Regardless of how this Court rules on the scope and coverage of Title IX, and even if it were to hold that consonant with Title IX Iron Arrow could return to the campus with its sex-discriminatory practices intact, Iron Arrow would be unable to do so. Therefore, this case is now moot and should be dismissed.

> Moreover, the exception to the mootness doctrine for allegedly illegal actions "capable of repetition yet evading review," has no application here. *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498 [31 S.Ct. 279, 55 L.Ed. 310] (1911). This exception is limited to situations where the action under challenge is too short in duration to be fully litigated before it expires or ceases. *See, e.g., First National Bank of Boston v. Bellotti,* 435 U.S. 765 [98 S.Ct. 1407, 55 L.Ed.2d 707] (1978) (restrictions on candidacy or participation in state elections); *Sosna v. Iowa,* 419 U.S. 393 [95 S.Ct. 553, 42 L.Ed.2d 532] (1975) (durational residency requirements); *Roe v. Wade,* 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973) (anti-abortion statute). In such cases there must also be a reasonable expectation that the same plaintiff would be subject to the same action again. *Weinstein v. Bradford,* 423 U.S. 147 [96 S.Ct. 347, 46 L.Ed.2d 350] (1975). Clearly, this is not the kind of case where there might be insufficient time for a live controversy to be fully litigated. Nor is there any reason to believe that Iron Arrow will be the subject of future action by the Secretary, because the University has independently adopted a policy in full accord with the Secretary's position.
> (footnotes omitted)

The defendant Department of Education has likewise filed a suggestion of mootness and a motion to remand. That brief also suggests that the University of Miami may have now changed its position so that, based on its own non-discrimination policy, the University will not permit Iron Arrow to return to campus unless it agrees to admit women and that this policy applies irrespective of the Department of Education's enforcement efforts. The Government reminds us that the initial question in this litigation was the standing of Iron Arrow to bring the suit against the federal agency. The case was initially dismissed for lack of standing. This Court reversed in light of the "unequivocal statement of the position of the University of Miami that but for the action of the Secretary of Health, Education and Welfare, it would not have barred and would not in the future bar the Iron Arrow Honor Society from its campus." *Iron Arrow Honor Society v. Califano,* 597 F.2d 590, 591 (5th Cir.1979).

The Government today appropriately argues that a change in the University's position would moot Iron Arrow's grievance against the Government defendant. The brief argues:

[A]t the outset of this litigation, Iron Arrow satisfied the personal stake requirement. Iron Arrow's inability to perform its functions on campus plainly constituted sufficient injury in fact. Although this injury was directly attributable to the University's decision to expel Iron Arrow from campus, the University had stated that this decision was based entirely upon HEW's threat of enforcement and that but for this threat the University would permit Iron Arrow to return to campus. In these circumstances, Iron Arrow's injury could fairly be traced to HEW's conduct and would likely be redressed by a favorable decision.

It then argues that if indeed Iron Arrow will not be permitted to return to campus because of the University's non-discriminatory position, then

Iron Arrow's injury would be attributable solely to the University's independent decision to keep Iron Arrow off campus, whatever position may ultimately be taken by the Department of Education. In such circumstances, Iron Arrow no longer would have a sufficient stake in the outcome of this litigation to satisfy Article III and the case should be dismissed as moot.

These arguments compel a remand to the district court to determine the present position of the University with respect to Iron Arrow's campus activities, as determined by the Board of Trustees, and perhaps just as importantly to determine the position of the Department of Education in light of the University's position and the Supreme Court's decision in *North Haven Board of Education v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). There is a possibility that the plaintiff and the defendants are in agreement on both the law and the facts in this lawsuit. The Government's brief does not directly confront the merits, but suggests the following in a footnote:

Prior to the Supreme Court's decision in *North Haven,* the Department took the position that University "assistance" to Iron Arrow of a nonfinancial nature was sufficient to invoke Title IX coverage under the "significant assistance" regulation. *North Haven* casts considerable doubt on that analysis, however, by holding that the validity of regulations promulgated under Title IX depends on "the program-specific limitation of §§ 901 and 902" (50 U.S.L.W. at 4507 [102 S.Ct. at 1926] ). The lower federal courts of appeals are divided over the proper reach of the statute to wholly non-funded educational programs or activities where some federal financial assistance goes to the university. Compare *Rice v. President and Fellows of Harvard College,* 663 F.2d 336 (1st Cir.1981), *cert. denied,* [456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444] with *Haffer v. Temple University,* 688 F.2d 14 (3d Cir.1982), relying on *Grove City v. Bell,* 687 F.2d 684 (3rd Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1181, 75 L.Ed.2d 429 (1983). See also the

well-reasoned decision in *University of Richmond v. Bell,* 543 F.Supp. 321 (E.D. Va.1982).

The decision by this Court only permits the Government to enforce its regulations as it interpreted them at the time of this suit, and does not require the Government to adhere to that interpretation.

Although the court's opinion recites that Iron Arrow vigorously opposed the motion of the Government to remand for a determination of mootness, the thrust of Iron Arrow's position was to have this Court, at the appellate level, decide issues which should first be decided by the trial court. Iron Arrow concedes that this case may now be moot, depending upon the present position of the University and the Government. It requests this Court to require the University and the Government to file pleadings on the issues in this Court, and thereafter determine whether the case is moot.

The cases concerning the proposition that voluntary discontinuance of illegal activity does not operate to remove the case from the ambit of judicial power are conceptually inapplicable. The University is not a party and not the object of injunctive relief. The Government has not tried to render an injunction unnecessary by discontinuing illegal activity. The facts have changed so that the Government may well decide not to withhold funds, regardless of Iron Arrow's position as to whether it can or can not, and regardless of what a federal court might order.

In sum, it appears that the Court has reached out to decide a difficult legal issue that may well have an effect on other parties in a case where it has no effect on the present parties.

On the merits, I would simply vacate our prior opinion and remand to the district court to reconsider in the light of *North Haven.* Assuming they are inclined to do so, the parties ought to have a full chance to litigate the facts of this case as they apply to the law in light of that decision and its reference to "the program-specific" limitations of § 901 and § 902. In my judgment, the record in this case simply does not permit a decision on the effect of *North Haven* on this case.

I would remand to the district court for consideration of mootness, and if there is still a case or controversy, to decide the merits on the facts as they may be found in relation to the "program-specific" gloss on § 901 and § 902, and on the regulations as they may now be interpreted by the Government in the light of *North Haven.*